*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0425p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DAVID A. MAPLES,

        *Petitioner-Appellant,*

    *v.*

JIMMY STEGALL, Warden,

        *Respondent-Appellee.*

No. 04-1880

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-71718—Victoria A. Roberts, District Judge.

Argued: May 31, 2005

Decided and Filed: October 25, 2005

Before: MOORE and COOK, Circuit Judges; GWIN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Craig A. Daly, Detroit, Michigan, for Appellant. Laura Graves Moody, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Craig A. Daly, Detroit, Michigan, for Appellant. Brad H. Beaver, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

---

## OPINION

---

    GWIN, District Judge. This case comes before us on a second appeal, after we had earlier remanded the case to the district court to address a single issue: whether, as part of Petitioner David Maples's ineffective-assistance-of-counsel claim, his Sixth Amendment speedy trial claim had merit. In his initial habeas petition, Petitioner claimed a violation of his right to effective assistance of counsel. He complained that his trial counsel provided ineffective assistance by advising him that his guilty plea reserved his speedy trial claim for appeal, when in reality it did not. Maples claims that, but for his counsel's deficient advice, he would have insisted on going to trial rather than plead guilty.

---

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

1

We earlier found that trial counsel's performance had indeed been deficient. We also found that Petitioner had satisfied his burden to show a reasonable probability that, but for counsel's erroneous advice, he would have gone to trial. *Maples v. Stegall*, 340 F.3d 433, 439-40 (6th Cir. 2003) (*Maples I*). As a result, we determined that "on the surface," Petitioner had satisfied the prejudice prong of the ineffective-assistance test outlined in *Strickland v. Washington*, 466 U.S. 668 (1984); *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). We also noted, however, that *Hill* advised us to consider the merits of the underlying claim in fully adjudicating the prejudice inquiry. *Maples I*, 340 F.3d at 440. We therefore remanded to the district court to determine, in the first instance, the merits of Petitioner's speedy trial claim.

Upon remand, the district court ruled in favor of the Respondent, finding that Petitioner's speedy trial claim had no merit and thus that Petitioner had suffered no violation of his right to effective assistance of counsel. We now **REVERSE**.

## I.  BACKGROUND

Petitioner David Maples ("Maples") complains that Michigan violated his constitutional right to a speedy trial when it failed to bring him to trial until over two years after his arrest. The facts relevant to Petitioner's speedy trial claim are as follows:

### A. Initial Delays and Entrapment Motion

On August 4, 1993, Petitioner and his co-defendant, James Murphy, were arrested for delivery of and conspiracy to distribute over 50 grams of cocaine. The Petitioner was detained and remained in state custody. On August 6, 1993, the state prosecutor filed the complaint and warrant. The state trial court set a trial date of October 19, 1993, but continued the trial until November trial call, at the request of co-defendant Murphy. Around this time, the court became aware that co-defendant Murphy was contemplating an entrapment defense. In its October 19, 1993 disposition continuing Maples's trial date, the court ordered Petitioner to file all motions within 10 days, and set co-defendant Murphy's entrapment hearing for the trial date.

On November 2, 1993, in preparation for trial, Petitioner Maples filed a pretrial motion for supplemental discovery and a motion in limine. The motion in limine sought to exclude Petitioner's prior criminal record on grounds that it would prejudice Petitioner, particularly as he planned to testify at trial. Nothing suggests this motion was complicated or presented any unique issue.

On December 9, 1993, the trial court continued the trial until January 11, 1994.[1] On January 10, 1994, Petitioner moved to continue the trial date because his attorney was unavailable. This resulted in a short delay of only 9 days, as the trial was re-set for January 19, 1994.

On January 19, 1994, the state trial court again continued the trial date until February 4, 1994, at the co-defendant's request to file motions. On February 3, 1994, the eve of trial, co-defendant Murphy filed his entrapment motion.[2] A hearing on the co-defendant's entrapment motion began on February 4, 1994, and continued on February 23-25, 1994, thereby delaying trial even further. The trial court then gave the state and co-defendant Murphy 30 days to file proposed

---

[1]On December 9, 1993, Petitioner joined his co-defendant's motion for an alleged violation of the "12-day rule." Neither the record nor the parties' briefs explain what this 12-day rule refers to.

[2]Initially, Petitioner Maples did not join the motion. He only joined the motion on April 29, 1994, almost three months after co-defendant Murphy filed the motion and over six months after the court was aware that co-defendant was contemplating raising the defense.

findings of fact and conclusions of law. In contrast to Petitioner Maples, who remained in custody during this time, co-defendant Murphy was released on bond.

After beginning the hearing on co-defendant Murphy's entrapment defense on February 4, 1994, and continuing it on February 23-25, 1994, the state trial court scheduled argument on the entrapment motion on March 16, 1994, and ordered that transcripts be prepared. The hearing concluded on April 11, 1994, on which date Petitioner testified in support of the entrapment motion. On April 29, 1994, Petitioner joined the motion and filed a brief in support. On June 3, 1994, the trial was continued again pending the court's decision on the entrapment motion. It appears the co-defendant did not file a brief in support of the motion until June 2, 1994. On July 14, 1994, the trial court finally issued an opinion denying the Petitioner's and co-defendant's motion. The Michigan state court thus delayed the trial over five months to decide an entrapment claim. Petitioner remained in custody during most of that period.

### B. Petitioner's Motion for Release

In the meantime, on April 8, 1994, Petitioner filed a motion for release on personal bond, arguing that he had been incarcerated for 250 days without trial, well beyond the 180 days allowable under Michigan law. On April 11, 1994, the court ordered the prosecution to file a written response to the motion within 10 days. On April 29, 1994, Petitioner filed a motion for immediate release, noting that the prosecution had not yet filed its response. On May 5, 1994, the prosecutor filed an opposition to the motion for immediate release. On May 9, 1994, the court held a hearing and granted Petitioner's motion for immediate release. Petitioner, however, was sent directly to St. Clair County for a probation violation, and on May 23, 1994, was sentenced to 2 ½-5 years in the Department of Corrections. Petitioner was re-incarcerated and spent the next seven months in the St. Clair County Jail.

### C. Summer 1994 - Summer 1995

As mentioned, the state court adjourned the trial date of June 3, 1994, pending resolution of the entrapment motion, and finally ruled on that motion on July 14, 1994. On July 29, 1994, the trial was continued yet again. Although the record is somewhat unclear, it appears that Michigan caused this continuance by failing to transport Petitioner Maples from the correctional institution to the trial. After continuing the trial in July 1994, it is nowhere clear why the trial court failed to reschedule the case for trial in August, September, or October 1994.

On November 18, 1994, and again on December 7, 1994, co-defendant Murphy moved to adjourn the trial. Petitioner Maples did not join these motions to continue. Indeed, on December 24, 1994, Petitioner wrote a pro se letter to the trial court, requesting new counsel, and complaining that his counsel had not filed a speedy trial claim at the end of November. In early January 1995, Maples filed a pro se motion seeking dismissal for violations of the 180-day rule and his constitutional speedy trial right.

On April 28, 1995, the Court re-set Petitioner's trial for June 22, 1995, due to trial in another matter. On June 27, 1995, the court continued the trial once again until August 29, 1995, providing no reason. On August 22, 1995, Petitioner again filed a motion to dismiss for violations of the 180-day rule and his constitutional speedy trial right.

On August 29, 1995, the trial was again continued until September 19, 1995, because "plea negotiations failed." The Respondent admits that these plea negotiations involved co-defendant Murphy, not Maples. On September 19, 1995, co-defendant Murphy pled guilty. Also on September 19, 1995, the Court denied Petitioner's motion to dismiss. On September 20, 1995, the date of Petitioner's trial, Petitioner reaffirmed his desire to reject the prosecution's plea offer. Petitioner also expressed his intention to call co-defendant Murphy as a witness. Thereafter, jury

selection began. Before jury selection was complete, Petitioner again moved for dismissal based on a speedy-trial violation. Following jury selection, Petitioner pled guilty.

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal habeas court may grant an application for a writ of habeas corpus on behalf of a state prisoner only where a claim adjudicated on the merits in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

In *Maples I*, we determined that our review of Maples's ineffective-assistance-of-counsel claim was not circumscribed by the state court's conclusion – as normally required by AEDPA – because the state court had not adjudicated the matter on the merits. *See Maples I*, 340 F.3d at 437 (citing *Wiggins v. Smith*, 539 U.S. 510 (2003)). We therefore reviewed the legal issue de novo.

This case is again before us on a charge of ineffective assistance of counsel, and for the same reasons as in *Maples I*, we are not bound by any state court conclusion. We therefore review Maples's claim de novo. *See Smith v. Hofbauer*, 312 F.3d 809 (6th Cir. 2003) ("Whether [Petitioner] was deprived of his right to effective assistance of counsel is a mixed question of law and fact that is reviewed de novo.") (citation omitted).

In determining whether Petitioner was prejudiced by his counsel's ineffective assistance, we review the merits of his underlying claim. *See Maples I*, 340 F.3d at 440. In determining the merits of a speedy trial claim, we review questions of law de novo, and questions of fact under the clearly erroneous standard. *United States v. Schreane*, 331 F.3d 548, 553 (6th Cir. 2003).

## III. ANALYSIS

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy trial and public trial." U.S. Const. amend. VI. The right to a speedy trial applies to the states through the Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S. 213 (1967).

In *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the Supreme Court articulated four factors that must be considered in determining whether the right to a speedy trial has been violated: (1) whether the delay was uncommonly long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice resulted to the defendant. No one of these factors constitutes a "necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Barker*, 407 U.S. at 533. "Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.*

### A. Length of the Delay

The length of the delay is a threshold requirement. If the length of the delay is not "uncommonly long," then judicial examination ends. *Doggett v. United States*, 505 U.S. 647, 652 (1992). The length of the delay is measured from the date of the indictment or the date of the arrest, whichever is earlier. *United States v. Marion*, 404 U.S. 307, 320 (1971); *Redd v. Sowers*, 809 F.2d

1266, 1269 (6th Cir. 1987). A delay approaching one year is presumptively prejudicial and triggers application of the remaining three factors. *Doggett,* 505 U.S. at 652 n.1. Here, Petitioner suffered a delay of approximately twenty-five (25) months between his arrest and the date of his trial and guilty plea. The Respondent does not dispute that this period meets the "uncommonly long" standard, particularly given the uncomplicated nature of the narcotics charge. We therefore proceed to examine the other three factors.

### B. Reason for the Delay

The second factor that *Barker* advises us to consider is the reason for the delay. In considering this factor, we weigh some reasons more heavily than others. For instance, government delays motivated by bad faith, harassment, or attempts to seek a tactical advantage weigh heavily against the government, while "more neutral" reasons such as negligence or overcrowded dockets weigh against the state less heavily. *United States v. Schreane*, 331 F.3d 548, 553-54 (6th Cir. 2003) (citing cases). The purpose of the inquiry is to determine "whether the government or the criminal defendant is more to blame for [the] delay." *Doggett*, 505 U.S. at 651.

Here, Respondent Stegall contends that, of the 25-month delay, one-half was attributable to the Petitioner. Respondent further contends that the rest of the period, while not attributable to Petitioner, is also not attributable to the state, because the delay was motivated neither by bad faith nor harassment. Thus, at most, contends Respondent, this factor should be "neutral," weighing in neither party's favor. *See United States v. Schreane*, 331 F.3d 548, 554-55 (6th Cir. 2003) (finding that each of two roughly equal time periods favored a different party).

We are unconvinced by Respondent's arguments. The delay in the first 9-10 months is only minimally attributed to Maples, instead largely caused by a combination of co-defendant's requests for continuances and the Michigan trial court's unjustified delay in ruling on the entrapment motion. The remaining period is entirely attributable to the court's unexplained continuances.

The Respondent argues that Petitioner is accountable for the initial 9- to 10-month delay, including the time it took the court to adjudicate the co-defendant's entrapment motion, because Petitioner eventually joined in co-defendant Murphy's entrapment defense. However, co-defendant Murphy did not actually file his motion to dismiss based on entrapment until February 3, 1994. Although in October 1993, the court was aware that co-defendant Murphy intended to present an entrapment defense, the docket clearly reflects that the court did not adjudicate the motion until after it was filed. Moreover, once the motion was filed, the trial court had ample time to rule before Maples joined, and his joining added nothing substantive to the issues at stake. Co-defendant Murphy filed the entrapment motion on February 3, 1994, and a hearing was begun the next day (also scheduled as the trial date). The Petitioner only joined the motion on April 29, 1994, almost three months after the motion was filed. Yet the Michigan trial court took until July 18, 1994 to decide the motion. At most, Petitioner can be held responsible for the 2 1/2-month period between April 29, 1994 and July 18, 1994.[3]

While in some cases the adjudication of pretrial motions justifies delay, in this case, there were very few motions, and nothing indicates that Defendant joined or filed them for purposes of delay. *Compare United States v. Schlei*, 122 F.3d 944, 987 (11th Cir. 1997) (over 100 pretrial motions filed) and *United States v. O'Dell*, 247 F.3d 655, 668 (6th Cir. 2001) (parties' motions "all submitted to some strategic end"). Indeed, in the midst of the entrapment adjudication, Petitioner moved for personal bond, thus asserting his speedy trial right. This assertion, although also analyzed

---

[3]We do not decide under what circumstances one defendant who delays joining a codefendant's motion should be held responsible for the full amount of time taken in ruling on the motion. We leave that issue for another day. In this case, however, we find the delay substantial enough to attribute only the latter portion to Petitioner.

under a separate inquiry, functions as a factor in his favor during this time period. *See Schreane*, 331 F.3d at 555 (counting defendant's failure to assert speedy trial right a reason weighing against the defendant in balancing the second factor).

The Respondent further suggests that any delay caused by the co-defendant, including delays related to the adjudication of the entrapment motion, should be weighed against the Petitioner and in the state's favor. In contending that the Petitioner should be saddled with the delay occasioned by his co-defendant, Respondent relies on cases interpreting the Speedy Trial Act and argues that reasonable delay attributable to the co-defendant should be attributable to Petitioner. *See* 18 U.S.C. § 3161(h)(7) (holding excludable "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted"); *United States v. Cope*, 312 F.3d 757, 776-77 (6th Cir. 2002) (stating that, under Speedy Trial Act, one speedy trial clock governs co-defendants, so "the excludable delay of one defendant is ascribed to that of all of his codefendants") (citing *United States v. Culpepper*, 898 F.2d 65, 66-67 (6th Cir. 1990)).

We have found no cases that state definitively that the same principle should be applied in the context of a *constitutional* speedy trial claim.[4] A few cases addressing both the statutory and the constitutional claim simply seem to take for granted, with no forceful discussion, that the co-defendant's delays implicate the defendant in the constitutional analysis as well. *See, e.g., United States v. Vasquez*, 918 F.2d 329 (2d Cir. 1990) (after in-depth analysis of statutory requirement that defendant must move to sever before co-defendant's delays will be found unreasonable, concluding perfunctorily that reason for delay favored government in constitutional analysis, because "most of the 26 months at issue was consumed by consideration of defendants' various pretrial motions"); *United States v. Fuller*, 942 F.2d 454 (8th Cir. 1991) (failing to separately address constitutional claim after finding, under statutory analysis, that "any delay caused in this particular case was due in fact to the co-defendants' various motions before trial and was reasonable"); *Smith v. Richards*, 1992 U.S. App. LEXIS 3043 (7th Cir. 1992) (implicitly applying state statutory requirement that a defendant object to co-defendant's requests for continuance, in rejecting petitioner's argument, under constitutional analysis, that continuances were not properly attributed to him).

Although the above-cited cases do contain a measure of logic, contrary authority in this circuit suggests a defendant is not necessarily responsible for his co-defendant's decisions. In *United States v. Holyfield*, 802 F.2d 846 (6th Cir. 1986), we concluded that under the *statutory* analysis, a co-defendant's interlocutory appeal disadvantaged the defendants, as "an exclusion applicable to one defendant applies to all co-defendants." *Id.* at 847 (quoting *United States v. Edwards*, 627 F.2d 460, 461 (D.C. Cir. 1980)). In analyzing the *constitutional* claim, however, we stated:

> The second [*Barker*] factor, reason for the delay, does, however, favor the Holyfields. The delay was caused by a codefendant's appeal and was not induced by them nor did it involve them. They could have been tried soon after the first indictment. The government, however, chose to wait.

*Id.* at 848; *see also United States v. Graham*, 128 F.3d 372, 374 (6th Cir. 1997) (faulting district court for delay due to appointing co-defendant's counsel, and holding government responsible for co-defendant's intervening state trial).

---

[4] The district court cited to *United States v. DeJesus*, 887 F.2d 114, 116 n.1 (6th Cir. 1989), reasoning that the statutory requirement extends to the constitutional analysis, because "a claim which passes muster under the Speedy Trial Act generally satisfies the requirements of the Sixth Amendment right to a speedy trial." J.A. 189. This general reasoning does not convince us that every requirement of the Speedy Trial Act applies as well to the constitutional analysis. Moreover, there is no indication here that the delay would in fact survive the Speedy Trial Act.

In the context of Petitioner Maples's case, we find the latter cases more persuasive. We decline to require Petitioner to carry the full burden of his co-defendant's delays, when the co-defendant, who was out on bond, had less incentive than Petitioner to resolve the case. In addition, nothing suggests that Petitioner induced or had anything to do with co-defendant's decisions to delay. Indeed, Petitioner effectively objected to the delay by asserting his speedy trial right before he even joined the entrapment motion.

Ultimately, as in *Graham*, the responsibility for countenancing the co-defendant's delays in this case must rest with the trial court. For instance, the record reflects that co-defendant Murphy did not file his brief in support of the entrapment defense until June 2, 1994, the eve of the scheduled trial date, whereas Petitioner filed his brief on April 29, 1994. Particularly as Petitioner had moved for release from incarceration, the trial court should have been vigilant about the co-defendant's dilatory filing. As in *Graham*, the Michigan trial court "failed to assert itself in an attempt to move the process along." *United States v. Graham*, 128 F.3d 372, 373 (6th Cir. 1997). Considering the circumstances, we find that very little of the period before July 1994, including periods caused by co-defendant's delays, should be imputed to Petitioner. At most, Petitioner should be held responsible for three months of the delay.[5]

Once the entrapment motion was adjudicated, the ensuing delays were attributable to the state. The district court faulted Petitioner for the July 29, 1994 continuance, but Respondent does not dispute Petitioner's contention that this continuance was actually due to the state's failure to bring Petitioner in from custody. The November 1994 and December 1994 trial dates were continued at the request of co-defendant Murphy. These delays cannot fairly be attributed to Petitioner Maples. Maples has produced evidence that he asked his counsel to raise a speedy trial issue at the November 18, 1994, proceeding. Also, Petitioner has produced evidence tending to show that he had asked his counsel to file for separate trials, which his counsel did not do. Given these indicia of discontent, we do not hold Petitioner accountable for the co-defendant's delays in November 1994 and December 1994. *See United States v. Holyfield*, 802 F.2d 846-47 (6th Cir. 1986) (declining to attribute delay due to co-defendant's appeal to defendants).

Finally, once Petitioner sought new counsel and moved for dismissal on speedy trial grounds, he could not be blamed for further delay. The court adjourned the matter several times during the spring of 1995, often without giving a reason. Although "negligence and overcrowded dockets" do not weigh as heavily against the state as does bad faith, the government must ultimately bear the responsibility for such circumstances. *See Barker*, 407 U.S. at 531. The 14-month period between July 1994 and September 1995, then, is attributable to the state.

While Petitioner may be held responsible for some minimal part of the nine-month period before July 1994, when the twenty-five months are considered as a whole, the reason-for-delay factor tips strongly in Petitioner's favor.

### C. Petitioner's Assertion of His Speedy Trial Rights

The third factor is Petitioner's assertion of his speedy trial rights. A "defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the

---

[5]We believe this determination to be circumstances-dependent and we do not find that delay associated with a co-defendant's motion to continue can never count against a defendant. In some circumstances, a defendant who late joins a co-defendant's motion for continuance could be found responsible for the time delay before he joined the motion. In other circumstances, not. In deciding whether delay caused by a co-defendant's motion should count, we will examine whether the defendant objected to the continuance, whether the defendant moved the trial court to comply with speedy trial requirements, whether the defendant moved for release, and whether the defendant's position and interests are aligned with the co-defendant.

defendant is being deprived of the right." *Barker*, 407 U.S. at 531-32. The Sixth Circuit recognizes a request for bail as the functional equivalent of the request for a speedy trial. *Redd v. Sowers*, 809 F.2d 1266, 1271 (6th Cir. 1987); *Cain v. Smith*, 686 F.2d 374, 384 (6th Cir. 1982).

Petitioner points to several instances in which he made clear his interest in a speedy trial. On April 8, 1994, and again on April 29, 1994, Petitioner moved for release on bond. In those motions, he cited a violation of Michigan's 180-day rule and asserted that the delays in bringing the case to trial were not attributable to him.[6] Next, on December 24, 1994, Petitioner wrote a pro se letter to the court, complaining that the 180-day rule had not been complied with after his re-incarceration and complaining that his attorney had not raised the issue in November 1994. In addition to the letter, on December 23, 1994, the Petitioner filed a pro se motion to dismiss, with brief in support, for violation of his speedy trial right. Finally, on August 22, 1995, and September 20, 1995, Petitioner moved again for dismissal on grounds of speedy trial violation.

Respondent argues that the motion for release on bond should not be considered an assertion of the speedy trial right, because it did not seek an advanced trial date, and in addition, was negated by Petitioner's joining the entrapment motion. Respondent further argues that the December 1994/January 1995 communications came five months after the entrapment motion was adjudicated and therefore was untimely.

We disagree that these failings undermine Petitioner's assertions. As noted, this circuit has recognized a request for bail as an assertion of a speedy trial right. *Redd v. Sowers*, 809 F.2d 1266, 1271 (6th Cir. 1987) ("[A] request for reduction of bail is equivalent to a request for a speedy trial."); *Cain v. Smith*, 686 F.2d 374, 384 (6th Cir. 1982). In this case, in his bond motions, Petitioner cited specifically to the Michigan rule requiring that the accused be brought to trial. As to the January 1995 motion to dismiss, Petitioner calculated his 180 days starting from May 23, 1994, when he was incarcerated for his parole violation, and determined that the period would be complete on November 22, 1994. According to his letter to the court, he asked counsel to raise the issue at the November 18, 1994, court proceeding. Just over a month later, he filed communication with the trial court. Considering the short gap of only one month, Petitioner was not untimely in filing the motion to dismiss at the beginning of January 1995.

Indeed, given how vigorously Petitioner asserted his right over the course of months from April 1994 to September 1995, we find that this factor weighs strongly in Petitioner's favor.

### D. Prejudice

The fourth factor to be analyzed is whether Michigan's unreasonable delay caused prejudice to the defendant. Petitioner first argues that he need not show any actual prejudice, because the delay in his case was presumptively prejudicial. We note that "presumptively prejudicial" for purposes of triggering the *Barker* four-factor inquiry is different from "presumptively prejudicial" for purposes of assessing the prejudice prong. The first only requires that the delay have approached one year. The latter concerns whether the delay was excessive.

### 1. Presumptive Prejudice

The Supreme Court has stated that the accused need not point to "affirmative proof of particularized prejudice" in every case. *Doggett v. United States*, 505 U.S. 647, 655 (1992). Rather,

---

[6]The trial court granted Maples's April 29, 1994 motion, but he was sent from Macomb County Jail to St. Clair County Jail to await a hearing on a charge of violating probation. The hearing was held on May 9, 1994, and he was re-incarcerated on May 23, 1994. Petitioner was released from prison on January 10, 1995.

stated the Court, "we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.*

Presumption of prejudice is not automatically triggered, however, in every case in which there is a delay. *See United States v. Howard*, 218 F.3d 556, 564 (6th Cir. 2000). When the accused is unable to articulate the harm caused by the delay, the reason for the delay helps determine whether the delay was presumptively prejudicial. For example, where, as here, the delay was due to state negligence,

> the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness, and its consequent threat to the fairness of the accused's trial. . . . [However,] to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice.

*Doggett*, 505 U.S. at 657 (citation omitted); *see also id.* at 655-56 ("[Presumptive prejudice] is part of the mix of relevant facts, and its importance increases with the length of the delay."). In *Doggett*, the Court found sufficiently excessive a delay "six times as long as that generally sufficient to trigger judicial review." *Id.* at 658. In other cases, delays have been similarly long. *See United States v. Graham*, 128 F.3d 372, 376 (6th Cir. 1997) (8 years); *United States v. Brown*, 169 F.3d 344, 351 (6th Cir. 1999) (5 ½ years).

In the Sixth Circuit, no presumption has been found where delay due to government fault is considerably less than that in *Graham* or in *Brown*, or where the government can persuasively rebut the presumption by showing that the delay did not impair the defendant's defense. *See, e.g., Darnell v. Berry,* 1999 U.S. App. LEXIS 15625 (6th Cir. 1999) (unpublished decision) (18-month delay not presumptively prejudicial); *United States v. Cook*, No. 98-5457, 1999 U.S. App. LEXIS 10645, at *3 (6th Cir. 1999) (unpublished decision) (16-month period attributable to government not presumptively prejudicial); *United States v. Love*, 1997 U.S. App. LEXIS 27928 (6th Cir. 1997) (unpublished decision) (17-19 month delay attributable to government – out of total 23 or 32 months – was significant but sufficiently rebutted because government proved delay did not impair defendant's defense); *United States v. Mundt*, 29 F.3d 233 (6th Cir. 1994) (although government responsible for one-half of 3½-year delay, government's diligent efforts to locate and prosecute defendant favored government); *see also United States v. Mulligan*, 520 F.2d 1327 (6th Cir. 1975) (25-month total delay did not give rise to speedy trial violation where only part of the total delay was due to government, and defendant had not timely asserted his right); *United States v. Freeding*, 663 F.2d 1073 (6th Cir. 1981) (unpublished decision) (upholding denial of speedy trial claim where delay was 21 months); *Dean v. Marshall*, No. 88-3515, 1989 U.S. App. LEXIS 10755 (6th Cir. 1989) (unpublished decision) (in pre-*Doggett* case, requiring actual prejudice even where delay was 5 years); *United States v. Love*, 1999 U.S. App. LEXIS 2053 (6th Cir. 1999) (unpublished decision) (discussing only actual prejudice, even where delay was 21 months).

Here, Petitioner suffered a delay of 25 months, 22-24 months of which can be attributed to the state. Although this period is longer than that in the above-cited cases, we need not determine whether the delay here is presumptively prejudicial. We find the fourth factor favors Petitioner, because he has produced sufficient evidence to show that he suffered actual prejudice.

### 2. Actual Prejudice

The Supreme Court has identified three defense interests a court should consider when determining actual prejudice in speedy trial cases: (1) oppressive pretrial incarceration; (2) anxiety and concern of the accused; (3) the possibility that the defense will be impaired. *Barker*, 407 U.S.

at 532. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious." *Id. But see Doggett*, 505 U.S. at 659-62 (Thomas, J., dissenting) (noting contrary precedent stating that the *liberty* interests – and not the concern with impairment of the defense – are at the core of the speedy trial right).

In this case, Petitioner appears to have suffered all three forms of prejudice. As to the first, Petitioner was subject to pretrial incarceration twice: between August 1993 and May 1994, and again between May 1994 and January 1995. The district court suggests that the latter period was not particularly oppressive, since Petitioner served that sentence due to a prior parole violation and not because he was awaiting trial on the narcotics charge. Citing Michigan law, the district court wrote, "The sentence in this narcotics case would not have run concurrently to the sentence he was serving for another felony even if Petitioner had been tried and sentenced earlier." J.A. 193.

As Petitioner points out, however, the relevant Michigan provision stated that a consecutive sentence would only have been required if the first term of imprisonment was for "the *commission* of another *felony*." Mich. Comp. Laws § 333.7401(3) (1995) (emphasis added). Here, Petitioner was in custody on a probation violation for receiving and concealing stolen property, not for commission of another felony. Thus, he was eligible to receive a concurrent sentence. We find that the incarceration harmed his liberty interest.

As to the second defense interest: Petitioner's repeated invocation of Michigan's 180-rule, requiring that the accused be tried within 180 days, suggests that he suffered "anxiety and concern." *See, e.g.,* David Maples, Letter to the Trial Court, December 24, 1994, J.A. 156; *see Barker*, 407 U.S. at 531 ("The frequency with which the defendant asserts his speedy trial right is probative indication of the prejudice he is suffering."). In another letter to the court prior to sentencing, Maples stated:

> I have lost everything of any value, monetary, and all personal relationships regarding my Ex and my children. This has put more than a little stress and strain on all concerned. My mother, my wife, my children, and myself! I don't know how much I am to suffer for an offense I'm only guilty of being ignorant of Mr. Murphy's business adventures!!!

J.A. 108. It is clear that Petitioner suffered "anxiety and concern."

Finally, the third defense interest requires examination of impairment to Petitioner's defense. Petitioner alleges that two key witnesses were not available to testify, due to the delay in bringing him to trial: co-defendant James Murphy, and Larry Roberts. Roberts's case was dismissed at the preliminary examination for lack of evidence, and by September 1995, defense counsel could not locate him. Co-defendant Murphy was unavailable to testify because his plea agreement with the government required that he not testify on behalf of Petitioner. We discuss each below.

### a. Inability To Locate Roberts

Larry Roberts was unavailable to testify because in September 1995 defense counsel was unable to locate and contact him. The value of Roberts's testimony – and thus how much his unavailability hurt Petitioner – is strongly disputed. In an affidavit dated January 27, 2004, Petitioner avers that Roberts visited him while Petitioner was at Macomb Regional Facility and told Petitioner he would testify on Petitioner's behalf. The record also includes a letter, written by co-defendant Murphy on August 9, 1993, indicating that Roberts was present at the scene and could attest to Petitioner's actions:

> I made arrangements to be met by my friend Dave Maples to discuss some upcoming roofing work we could both be involved in and to loan him some money so he could purchase a work truck. It is my understanding that [Maples] arranged for his friend Larry Roberts to give him a ride to the bar with the promise of gas money and a couple drinks. I now state that neither Roberts [n]or Maples gave me any controlled substance, nor did they aid me in the delivery of such to any other individual.

James Murphy, Letter, Aug. 9, 1993, J.A. 90; *see also* David Maples, Letter to Court Prior to Sentencing, J.A. 106-07 (describing incident, including interaction with Roberts).

Respondent claims that Roberts could not have provided any exculpatory testimony. Respondent states that when both men were in the police station after arrest, Roberts called out to Petitioner Maples, saying, "Tell them I had nothing to do with it." Maples, purports Respondent, replied, "He didn't." Respondent's Br. at 12 (citing Pl. Br. in Opp. to Mot. to Dismiss, J.A. 168). From this, Respondent suggests, it is clear that Roberts never denied any wrongdoing by Petitioner, only as to himself. Respondent further suggests that we should infer from this statement that Petitioner must have been involved in the wrongdoing, otherwise he could not have known that Roberts was not involved. Respondent also argues – and the district court agreed – that Roberts's testimony was not guaranteed: Roberts' attorney apparently told the prosecutor that he would advise his client against testifying.

Respondent has provided no documentation of Roberts's purported statement at the police station, other than the state's own brief in opposition to the April 1994 motion for release. Petitioner, for his part, strongly disputes the state's version of the facts. In his January 2004 affidavit, he denies having responded, "He didn't." He avers that, instead, he stated, "Shut up," in response to Roberts's request.

Whether Petitioner said, "He didn't," or "Shut up," from this limited record, we decline to infer Petitioner's culpability or speculate as to what a jury might find. Because Roberts was apparently present at the scene, and was in contact with Petitioner at around the time of the crime, he could very well have provided beneficial testimony. *Cf. Redd v. Sowers*, 809 F.2d 1266, 1272 (6th Cir. 1987) ("[A]ppellee was placed in a disadavantaged position in attempting to locate [favorable witnesses] to secure this testimony thirty-two months after his arrest . . . [A]ppellee would have had a much better chance of locating the witnesses in 1981 than in 1983.").

While Petitioner has not presented the strongest evidence that Roberts would have appeared to testify on his behalf (Petitioner's affidavit was signed in January 2004), Respondent's evidence to the contrary is even weaker. The district court accorded significant weight to a letter, written by Roberts's attorney, stating that he would advise Roberts not to testify on behalf of Petitioner. As with Roberts's post-arrest statement, this letter is not before us. More importantly, however, such a communication provides limited probative value in determining whether Roberts would or would not have testified. As the state itself pointed out, Petitioner, too, was advised by his counsel not to testify on behalf of his co-defendant (in the entrapment hearing), yet he insisted on testifying anyway. *See* State's Resp. to Def. Mot. For Imm. Release, J.A. 141.

Based on the record before us, we think it sufficiently likely that Roberts would have testified on Petitioner's behalf that Petitioner's inability to contact Roberts in September 1995 prejudiced him.

### b. Unavailability of Co-defendant James Murphy

In addition, Petitioner was prejudiced by the unavailability of co-defendant Murphy to testify at his trial. As mentioned, co-defendant Murphy was unavailable because his plea agreement required that he not testify on behalf of Maples: "Part of the [plea] agreement consisted of my not

testifying at the criminal trial of, David Maples, in the above mentioned case. That if I choose [sic] to testify at that trial I would be facing a more severe sentence for doing so." J.A. 92. It is undisputed that Murphy's unavailability hurt Petitioner, as Murphy's testimony would have absolved Petitioner of any guilt. *See* Respondent's Br. 13 ("It may very well be that Murphy pleading guilty hurt Petitioner's chances at trial. "); James Murphy, Letter, August 9, 1993 (stating facts supporting Petitioner's innocence – "I now state that neither Roberts [n]or Maples gave me any controlled substance, nor did they aid me in the delivery of such to any other individual.").

Indeed, Murphy's plea condition may have violated Petitioner's right to compulsory process. We have previously stated that "governmental conduct which amounts to a substantial interference with a witness'[s] free and unhampered determination to testify will violate due process." *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997). While a prosecutor can warn a potential defense witness about the consequences of perjury, a prosecutor cannot threaten to reinstate previous charges against that witness. *See, e.g., United States v Henricksen*, 564 F.2d 197 (5th Cir. 1977) (holding government violated due process when it told the co-defendant that his plea agreement would be void if he testified for a co-defendant); *United States v. Vavages*, 151 F.3d 1185, 1194 (9th Cir. 1998) (defendants' right to compulsory process violated when prosecutor threatened to prosecute defendant's wife for perjury or withdraw her plea agreement if she testified); *United States v. Golding*, 168 F.3d 700, 702-04 (4th Cir. 1999) (defendant's right to compulsory process violated when prosecutor threatened to initiate federal marijuana possession charges against defendant's wife if she testified on defendant's behalf). Petitioner was prepared to go to trial long before co-defendant Murphy entered a plea – and plea negotiations – prohibiting him from testifying on behalf of Petitioner. In addition, Murphy gave testimony that favored Petitioner at the entrapment hearing on February 24, 1994. Had the state tried Petitioner in a timely manner, blocking Murphy's testimony would likely have been no more imperative to the state than it had been in February 1994.

We therefore find that co-defendant Murphy's unavailability prejudiced Petitioner. Because we find that Petitioner was prejudiced both by the offense to his liberty interests as well as by impairment to his defense, this factor weighs in his favor.

To sum up our analysis under *Barker*, we find that (1) the delay was uncommonly long; (2) the reason for the delay weighs in favor of the Petitioner; (3) Petitioner's timely, repeated, and vigorous assertion of his speedy trial right weighs strongly in his favor; and (4) Petitioner was prejudiced by the delay. Considering all the factors together, we find that Petitioner was denied his right to a speedy trial.

Because we find that Petitioner's speedy trial right has merit, we find, under the analysis mandated by *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), that he was indeed prejudiced by his counsel's deficient performance in advising him that he could simultaneously take the guilty plea and retain his speedy trial claim for appeal. *See Maples I,* 340 F.3d at 440-41. We thus find that Petitioner Maples suffered a Sixth Amendment violation of his right to effective assistance of counsel.

CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's decision and **REMAND** this matter to the district court with directions to issue the Writ of Habeas Corpus and for further proceedings consistent with this opinion.