*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0421p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,

　　　　　　　　*Plaintiff-Appellee,*

　　*v.*

MARLON WATFORD, a/k/a Tony Vallie and Ronnie
Ross,

　　　　　　　　*Defendant-Appellant.*

No. 05-6184

>

———————

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 98-00097—Charles R. Simpson III, District Judge.

Argued: July 28, 2006

Decided and Filed:  November 14, 2006

Before:  MOORE and GIBBONS, Circuit Judges; ACKERMAN, Senior District Judge.[*]

———————

## COUNSEL

**ARGUED:** Scott T. Wendelsdorf, WESTERN KENTUCKY FEDERAL COMMUNITY DEFENDER, INC., Louisville, Kentucky, for Appellant.  Randy W. Ream, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee.  **ON BRIEF:** Scott T. Wendelsdorf, WESTERN KENTUCKY FEDERAL COMMUNITY DEFENDER, INC., Louisville, Kentucky, for Appellant.  Randy W. Ream, Monica Wheatley, Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellee.

　　　　ACKERMAN, J., delivered the opinion of the court, in which GIBBONS, J., joined. MOORE, J. (pp. 22-23), delivered a separate dissenting opinion.

———————

## OPINION

———————

　　　　HAROLD A. ACKERMAN, Senior District Judge.  Defendant-Appellant Marlon L. Watford appeals from the District Court's judgment of conviction and sentence following a jury's guilty verdicts on counts of narcotics and firearm possession.  Watford, through his able counsel, contends

———

[*]The Honorable Harold A. Ackerman, Senior United States District Judge for the District of New Jersey, sitting by designation.

that the District Court erred in several critical respects by allowing this case to proceed to trial after a lengthy pretrial delay during which the Government filed three superseding indictments. He also asserts that the District Court erred in its handling of voir dire and several sentencing-related issues. Having carefully considered Watford's arguments in light of the record submitted on appeal, we find no reversible error in the District Court's adjudication of this case. Accordingly, for the reasons that follow, we AFFIRM.

## I. BACKGROUND

On July 8, 1998, United States Marshals in Louisville, Kentucky were conducting surveillance of Watford, who was wanted in the State of Illinois on charges of murder and in the Central District of Illinois for violation of federal probation. Watford was also suspected of being involved in drug trafficking and maintaining a storage facility at which he stored between two and three kilograms of cocaine. The Marshals were warned that Watford likely would be armed with a 9mm handgun and wearing a bullet-proof vest.

Hoping to execute a fugitive warrant, the Marshals, along with other law enforcement officers, followed Watford as he left a residence on the 1300 block of South Third Street in Louisville, Kentucky. A short time later, between Eighth and Ninth Streets on Muhammad Ali Boulevard, they pulled over the yellow Toyota pick-up truck in which Watford was riding as a passenger and arrested him without incident. At the time of his arrest, Watford wore a bullet-proof vest and carried a 9mm Glock handgun in his right front pocket and a baggie containing what appeared to be drugs. Subsequent testing confirmed that the baggie contained 41.2 grams of crack cocaine.

With the assistance of the Drug Enforcement Administration, the Marshals obtained warrants to search several apartments located at 1341 South Third Street, including Watford's apartment. Before executing the warrants, however, agents placed the apartments under surveillance. Devon Hale, a known associate of Watford's, lived in an apartment upstairs from Watford. Agents observed Hale attempting to leave his apartment by the fire escape but retreating into the apartment upon spotting the police. Hale then repeatedly attempted to warn Watford of the police presence by sending the message "9-1-1" to Watford's pager, which agents now had in their possession. When Hale later left his apartment and was confronted by police, he denied knowledge of Watford's identity. Agents placed Hale under arrest and executed a search warrant on his apartment. The search revealed approximately $58,000 in cash and some firearms.

Agents subsequently executed a search warrant on Watford's apartment. There, hidden in a night stand, agents found 28 baggies that were later confirmed to contain 292.6 grams of crack cocaine. Agents also discovered $12,000 in cash hidden under Watford's mattress. A safe containing more than $136,000 in cash and a driver's license displaying Watford's photograph was also present in the apartment. In a bag under Watford's kitchen sink, agents discovered a disassembled sawed-off shotgun and several knives.

On July 9, 1998, one day after Watford's and Hale's arrests, federal prosecutors in the Western District of Kentucky filed a criminal complaint against Hale. The complaint charged Hale with conspiracy to possess with intent to distribute crack cocaine, and possession of a firearm that traveled in interstate commerce with an obliterated serial number. Watford was not immediately charged in that district, but was instead removed to state custody in Illinois to stand trial on the unrelated murder charges.

Approximately two weeks later, on July 22, 1998, a federal grand jury in the Western District of Kentucky returned a seven-count indictment against Watford and Hale for various weapons and narcotics offenses. Of relevance here, Count 1 charged Watford and Hale with conspiracy to

distribute and to possess with intent to distribute crack cocaine between October 1, 1997 and July 8, 1998; Count 2 charged Watford and Hale with knowingly and intentionally possessing with intent to distribute crack cocaine on or about July 8, 1998; Count 3 charged Watford with possessing a firearm in connection with Counts 1 and 2; and Count 4 charged Watford with possessing a firearm with an obliterated serial number and which had traveled in interstate commerce. In accordance with standard practice at the time, the Indictment did not specify any quantities of crack cocaine, nor did it cite the applicable penalty section of Title 21 of the United States Code. On the day the Indictment was returned, a federal magistrate judge in the Western District of Kentucky issued a warrant for Watford's arrest.

On October 21, 1998, Hale pled guilty to Count 2 of the Indictment and subsequently received a sentence of 46 months incarceration. Pursuant to Hale's plea agreement, the Government dismissed the remaining counts against Hale at the time of his sentencing.

Meanwhile, the state prosecution on the unrelated murder charges proceeded against Watford in the Kankakee County Circuit Court in Kankakee, Illinois. On June 27, 2002, a state jury convicted Watford on three counts of first-degree murder involving the drug-related shooting deaths of two individuals and the attempted murder of a third individual, as well as one count of aggravated battery with a firearm. At sentencing on September 19, 2002, Watford received a sentence of death for each first-degree murder conviction, and the court set an execution date for December 15, 2002. The execution date was apparently adjourned, however, and on January 11, 2003, Watford became one of the approximately 167 Illinois death row inmates whose sentence was commuted to life without the possibility of parole by outgoing Illinois Governor George Ryan. Thus, Watford's death sentence was commuted to life without parole on each of the three first-degree murder counts. Watford appealed his convictions to the Illinois Supreme Court.

The District Court's sentencing colloquy reveals that at some point after Watford's Illinois death sentence was commuted to three life sentences, the Illinois prosecutor became concerned that these sentences might be further commuted, or that the Supreme Court of Illinois might order a new trial. For reasons unexplained, the Illinois prosecutor also became concerned that Watford's state trial counsel might be disbarred. Indeed, according to the Assistant United States Attorney who prosecuted the case against Watford in the District Court below, the Illinois prosecutor's concerns proved "prophetic" when Watford's state trial counsel was later suspended from the practice of law. (J.A. at 312.) The Illinois prosecutor conveyed his concerns to federal authorities in the Western District of Kentucky and requested that they proceed in seeking a conviction and sentence on the pending federal charges.

Acting on this request, the United States Attorney's Office for the Western District of Kentucky made a decision to prosecute the pending federal charges against Watford. Accordingly, on February 18, 2004, a federal grand jury returned a four-count Superseding Indictment against Watford. As in the original Indictment, Count 1 of the Superseding Indictment charged Watford with conspiracy to distribute and possess with intent to distribute crack cocaine, although this Count no longer named Hale. Count 2 likewise charged Watford with knowing and intentional possession of crack cocaine. Counts 3 and 4 remained unchanged. Additionally, in response to the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Counts 1 and 2 now specified "50 grams or more" of crack cocaine. (J.A. at 28-29.) On the same day that the Superseding Indictment was returned, a federal magistrate judge issued a new warrant for Watford's arrest. Because Watford was in Illinois state custody, the court also issued a writ of *habeas corpus ad prosequendum* on March 22, 2004. Watford was arraigned in federal court on April 20, 2004 and remanded to federal custody.

On September 10, 2004, Watford, through his counsel, moved to dismiss Counts 1 and 2 of the Superseding Indictment for violation of his Sixth Amendment right to a speedy trial. The

District Court denied Watford's motion, finding that the delay in prosecuting Watford's case was not due to any Government effort to impede Watford's defense, but because Watford had been standing trial in Illinois on charges of murder. In addition, the District Court found that a federal detainer had been placed on Watford while he was in Illinois custody, yet Watford never asserted his right to a speedy trial prior to his motion to dismiss. Finally, the District Court found that Watford's pretrial incarceration was not oppressive, and that Watford presented no evidence that the delay impaired his defense.

After the Supreme Court's opinion in *Blakely v. Washington*, 542 U.S. 296 (2004), federal prosecutors became concerned that the Superseding Indictment did not allege drug quantities with sufficient specificity. Therefore, prosecutors convened another federal grand jury for the purpose of seeking a Second Superseding Indictment. The grand jury returned a four-count Second Superseding Indictment on January 4, 2005. Counts 1 and 2 of the Second Superseding Indictment specified a quantity of "approximately 350 grams" of crack cocaine (J.A. at 60-61), while Counts 3 and 4 remained unchanged.

On January 19, 2005, purportedly to correct a clerical error in the Second Superseding Indictment, federal prosecutors sought and obtained a Third Superseding Indictment. Counts 1 and 2 of the Third Superseding Indictment specified a quantity of "approximately 1.5 kilograms or more of a mixture or substance containing a detectable amount of cocaine base, commonly known as 'crack' cocaine." (J.A. at 66-67.)[1] Once again, Counts 3 and 4 remained unchanged.

On March 10, 2005, Watford moved to strike the Government's May 21, 2004 notice, pursuant to 21 U.S.C. § 851, of its intention to seek increased punishment based on one of Watford's prior criminal convictions.[2] The next day, Watford renewed his motion to dismiss Counts 1 and 2 of the Third Superseding Indictment on grounds that they violated his Sixth Amendment right to a speedy trial and were barred by applicable statutes of limitations. At the pretrial conference, the District Court deferred decision on the motion to strike until sentencing, and denied Watford's renewed motion to dismiss.

Trial commenced on March 16, 2005. During voir dire, the Government used peremptory strikes against jurors 271 and 298, both African-Americans. These strikes left an all-white jury to try Watford, who is an African-American. Watford's counsel objected at sidebar that the use of peremptory strikes to eliminate all African-Americans from the jury deprived Watford of his equal protection rights. The prosecutor justified his striking of juror 271 on the grounds that the juror had a rap sheet, and that the prosecutor had previously struck a white juror for the same reason. With respect to his striking of juror 298, the prosecutor offered that the strike was in error and that the juror information sheet he was using erroneously indicated that the juror was white. The prosecutor attributed the error to his secretary, who had prepared the juror information sheet and had erroneously indicated that juror 298 was white despite the juror having indicated on his jury questionnaire that he was an African-American. Having heard defense counsel's objections and the

---

[1]The sentencing memorandum that the Government filed with the District Court explains how the Government arrived at this quantity. Approximately 338 grams of crack were seized from Watford's person and apartment on July 8, 1998. In addition, Watford's apartment contained more than $136,000 in cash, which is equivalent to 3.8 kilograms of crack at a cash equivalency of $1,000 per ounce. Government witnesses would also testify at trial to having purchased from Watford a total of 1.425 kilograms of powdered cocaine, which the Government argued was equivalent to crack cocaine for sentencing purposes. Accordingly, the Government sought to attribute a total of 5.563 kilograms of crack cocaine to Watford, an amount clearly in excess of 1.5 kilograms. (J.A. at 138-39.)

[2]The conviction in question was a July 6, 1993 criminal conviction in the Central District of Illinois for possession of approximately 29 grams of crack cocaine.

prosecutor's proffered justifications, the District Court ruled that the striking of juror 271 was for a legitimate, non-discriminatory reason, and that the striking of juror 298 was not improper.

Several witnesses testified for the Government at trial. Shante Elliott York testified that she was driving the truck in which Watford was riding when he was arrested. She testified that throughout the summer of 1998, she had frequently driven Watford to various locations and had observed Watford to put crack cocaine into his pocket on several occasions. Additionally, she testified that Watford resided in Apartment 3 at 1341 South Third Street in Louisville, Kentucky.

Andre Lamont Wilson testified that he had been an associate of Watford and Hale, having first met them in September 1997. Wilson testified that he had purchased between 1 and 1.5 kilograms of cocaine from Watford at Watford's apartment between December 1997 and the spring of 1998. He further testified that he would "cook up" the powdered cocaine into crack cocaine at Watford's apartment and would later sell it in Shelbyville, Kentucky. According to Wilson, Watford and associate Duane Hale made frequent, 12-hour trips to Chicago, and would return with a "book bag full of kilos." (J.A. at 286.) Wilson, who had been arrested in the spring of 1998 for possession of crack cocaine, testified that he always observed Watford to be armed and wearing a bullet-proof vest. The reason for this, Wilson explained, was that Watford and associate Duane Hale were making enemies because they were able to buy cocaine in large quantities and later sell it for a discount.

Devon Hale also testified that he had purchased a total of approximately 15 ounces of powdered cocaine from Watford for around $11,000. He testified that he and Watford had cooked cocaine into crack and that he (Hale) had sold powder and crack cocaine. He conceded that the $58,000 in cash that agents seized from his apartment was proceeds from drug sales and gambling. Finally, Hale established that he and Watford had purchased bullet-proof vests together at Ray's Gun Range.

After the Government had presented its case in chief, and again at the close of the three-day trial, Watford argued that the evidence was insufficient to support a conviction and moved for judgment of acquittal. The District Court denied these motions. On March 18, 2005, the jury returned a verdict of guilty as to Counts 1, 2, and 3 of the Third Superseding Indictment. Only on Count 4, alleging the knowing possession of a firearm with an obliterated serial number, was Watford acquitted.

Watford subsequently moved for a post-verdict judgment of acquittal as to Count 1 for insufficiency of the evidence. In a June 14, 2005 memorandum opinion and order, the District Court granted the motion, agreeing with Watford that the Government's evidence at trial was insufficient to support a finding that Watford and Devon Hale had a common agreement or understanding to distribute crack cocaine. Accordingly, the District Court vacated the guilty verdict as to Count 1. The Government does not appeal this ruling.

After trial, Watford renewed his motion to strike the Government's § 851 notice. In a *pro se* supplemental objection to the § 851 notice, Watford also argued that his prior drug felony was, in fact, a misdemeanor. At the sentencing hearing on July 19, 2005, the District Court denied both the motion to strike and the supplemental objection. The court then found that Watford had an advisory offense level of 34 and an advisory criminal history category of IV under the U.S. Sentencing Guidelines ("Guidelines"). Accordingly, the court calculated an advisory sentencing range of 270 to 312 months that was increased, by operation of 21 U.S.C. §§ 841(b)(1)(A)(iii) and 851, to an advisory range of 300 to 312 months. The District Court sentenced Watford to 240 months on Count 2 of the Third Superseding Indictment and 60 months on Count 3, to run consecutively for a total term of imprisonment of 300 months, followed by 15 years of supervised release. In addition, the District Court held that the 240-month sentence, which may run either

consecutively or concurrently with the Illinois state sentence, would run consecutively.[3] Watford timely filed this appeal of the District Court's final judgment and sentence.

## II. ANALYSIS

### A.          *Watford's Right to a Speedy Trial*

Watford's primary argument on appeal is that the 69-month delay between his July 22, 1998 indictment and his April 20, 2004 arraignment violated his Sixth Amendment right to a speedy trial. He does not contest any additional delay that occurred between arraignment and trial. The Government justifies the pre-arraignment delay on the grounds that during most of the time in question, Watford was standing trial in Illinois on charges of murder and attempted murder. On at least two occasions prior to trial, the District Court rejected Watford's argument. We review a district court's adjudication of a speedy trial claim *de novo*, and we review questions of fact for clear error. *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. A criminal defendant's right to a speedy trial attaches only when a criminal proceeding has been initiated and the defendant "faces a real and immediate threat of conviction." *United States v. Sanders*, 452 F.3d 572, 579 (6th Cir. 2006). We have recognized that in most cases, the triggering event will be the filing of an indictment.[4] Whereas due process considerations generally govern pre-indictment delay, *United States v. Marion*, 404 U.S. 307, 324 (1971), post-indictment delay implicates the Sixth Amendment speedy trial guarantee, *United States v. Greene*, 737 F.2d 572, 575 (6th Cir. 1984). Here, Watford complains of prosecutorial delay that followed the filing of the July 22, 1998 Indictment. Thus, we reject the Government's contention that Watford's Sixth Amendment speedy trial rights did not accrue until his April 20, 2004 arraignment, and find that Watford's Sixth Amendment rights were implicated no later than the filing of the July 22, 1998 Indictment. *See id.*

The Supreme Court has rejected rigid rules for determining when a Sixth Amendment speedy trial violation has occurred in favor of an ad hoc balancing approach. *Barker v. Wingo*, 407 U.S. 514, 523-30 (1972); *see also Sanders*, 452 F.3d at 578 (discussing the *Barker* test in light of the purposes of the underlying right). Four factors guide a court's inquiry into the merits of a post-indictment speedy trial claim: "(1) whether the delay was uncommonly long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice resulted to the defendant." *Maples*, 427 F.3d at 1025 (citing *Barker*, 407 U.S. at 530). None of these factors, standing alone, is sufficient to establish a Sixth Amendment violation. *Barker*, 407 U.S. at 533. Rather, a court must conduct a balancing analysis that considers each of these factors, together with such other circumstances as may be relevant. *United States v. Schreane*, 331 F.3d 548, 553 (6th Cir. 2003).

### 1.          Length of the Delay

The first *Barker* factor serves as a threshold to any Sixth Amendment speedy trial claim.

---

[3] The 60-month sentence for Count 3 must run consecutive to the state sentence, pursuant to 18 U.S.C. § 924(c)(1)(D)(ii).

[4] Although arrest may also trigger an accused's Sixth Amendment speedy trial rights, *United States v. MacDonald*, 456 U.S. 1, 7 (1982), we need not decide whether Watford's July 8, 1998 arrest by federal authorities pursuant to a fugitive warrant from the State of Illinois and subsequent removal to state custody implicated his speedy trial right with respect to the federal prosecution. Watford complains only of post-indictment prosecutorial delay, and does not argue that his speedy trial rights were violated by any delay that occurred before the July 22, 1998 Indictment.

*Maples*, 427 F.3d at 1025. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530; *see also United States v. Brown*, 169 F.3d 344, 348 (6th Cir. 1999). A delay is presumptively prejudicial if it is "uncommonly long" or "extraordinary." *Doggett v. United States*, 505 U.S. 647, 651-52 (1992); *Barker*, 407 U.S. at 530-31; *United States v. Graham*, 128 F.3d 372, 374 (6th Cir. 1997). We have stated that a delay is presumed prejudicial when it exceeds one year. *Wilson v. Mitchell*, 250 F.3d 388, 394 (6th Cir. 2001); *United States v. Mundt*, 29 F.3d 233, 235 (6th Cir. 1994).

This case involves a delay of 69 months between arrest and arraignment. Such a delay clearly is "uncommonly long," and the Government does not seriously contest this point. Indeed, we have found much shorter delays to be presumptively prejudicial. *See, e.g.*, *Maples*, 427 F.3d at 1026 (finding that 25-month delay between arrest and date of trial and guilty plea was "uncommonly long" and warranted consideration of other factors). Therefore, we easily conclude that the 69-month delay in prosecuting Watford was "uncommonly long," thus giving rise to a presumption of prejudice and warranting our consideration of the remaining *Barker* factors.

### 2.      Reason for the Delay

We must next examine the reason for the 69-month delay. The Supreme Court has established a hierarchy of justifications for presumptively prejudicial delay.

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531 (footnote omitted). The purpose of this weighting scheme is to quantify "'whether the government or the criminal defendant is more to blame for [the] delay.'" *Maples*, 427 F.3d at 1026 (quoting *Doggett*, 505 U.S. at 651). Here, the Government argues that it took no efforts to prosecute Watford for nearly six years because during much of that time, Watford was actively being prosecuted for murder in Illinois. Although a federal magistrate judge issued a warrant for Watford's arrest on July 22, 1998, the Government asserts that seeking Watford's appearance by writ of *habeas corpus ad prosequendum* prior to completion of the Illinois prosecution would have been futile, as the Illinois authorities would not have surrendered Watford into federal custody. Watford counters that the Government's delay was in bad faith, and that the Government prosecuted its case only when it appeared that Watford's state conviction might be overturned.

This Court's decision in *United States v. Schreane* provides helpful guidance to our inquiry. In *Schreane*, we considered whether a 29-month delay between federal indictment and trial violated the Sixth Amendment. Our analysis compelled us to separate the total 29-month period into two smaller periods. During the first 15 1/2-month period, the defendant had been standing trial and awaiting sentencing on state charges. We observed that this delay "was due to the obvious need to allow the defendant to be prosecuted by the State without interference by the federal government." 331 F.3d at 554. Such delays were to be expected when a defendant violates the laws of several sovereigns, we noted, because "'at least one sovereign, and perhaps more, will have to wait its turn at the prosecutorial turnstile.'" *Id.* (quoting *United States v. Grimmond*, 137 F.3d 823, 828 (4th Cir. 1985)). We continued:

> Customarily—although certainly not always—the jurisdiction with custody of the accused . . . is afforded the first opportunity to prosecute the defendant. This longstanding practice is rooted in the respect accorded to a custodial sovereign to

> resolve its criminal proceedings before relinquishing custody to another jurisdiction. This practice also can be understood in terms of the orderly and efficient prosecution of cases in our dual system of criminal justice.

*Id.* at 554-55. Thus, we concluded that "'[s]imply waiting for another sovereign to finish prosecuting a defendant is without question a valid reason for delay' that weighs in favor of the government." *Id.* at 555 (quoting *Grimmond*, 137 F.3d at 828).

With respect to the 13 1/2-month period following the defendant's state-court sentencing, we found a variety of reasons for the ongoing delay. This delay was attributable, in part, to the state's failure to notify the defendant of the federal detainer; the state's failure, for more than eight months, to notify federal authorities of the disposition of the state prosecution; the federal government's failure to check on the status of the state prosecution; the federal government's five-and-one-half-month delay in prosecuting its case after learning of the state court disposition; and the defendant's failure to assert his Sixth Amendment rights after learning of the federal detainer. We concluded that these reasons, on balance, weighed in favor of the defendant. *Id.* at 555-56.

Following the example of *Schreane*, we first consider the 50-month delay between Watford's federal indictment on July 22, 1998 and his state sentencing on September 19, 2002. The record demonstrates that during this period, the State of Illinois was actively prosecuting Watford on murder charges. Watford's insistence that federal authorities nevertheless could have secured his appearance during this period by writ of *habeas corpus ad prosequendum* ignores principles of comity that the Government customarily observes when interacting with a custodial sovereign. As we explained in *Schreane*, "longstanding practice" dictates that respect be accorded to a custodial sovereign's prerogative "to resolve its criminal proceedings before relinquishing custody to another jurisdiction." *Id.* at 555. To do otherwise "'would be to mire the state and federal systems in innumerable opposing writs, to increase inmate transportation back and forth between the state and federal systems with consequent additional safety risks and administrative costs, and generally to throw parallel federal and state prosecutions into confusion and disarray.'" *Id.* (quoting *United States v. Thomas*, 55 F.3d 144, 150-51 (4th Cir. 1995)). Our respect for these principles leads us to conclude that the 50-month delay between Watford's federal indictment and his state sentencing was justified by the State of Illinois's active prosecution of Watford for murder. Under *Schreane*, this constitutes a valid reason for delay and weighs in favor of the Government.

After Watford's state sentencing, approximately 18 months passed before the District Court issued the writ of *habeas corpus ad prosequendum* on March 22, 2004.[5] The Government offers no explanation for this delay despite admitting in its appellate brief that the results of Watford's state conviction "became known" in "late 2002." (Appellee's Br. 25.) In the District Court, however, the Government represented that during 2003, the State of Illinois was appealing Governor Ryan's blanket commutation to the Illinois Supreme Court. (J.A. at 46.) *See People ex rel. Madigan v. Snyder*, 804 N.E.2d 546 (Ill. 2004) (rejecting state's petition for writ of mandamus, and listing Watford as a respondent). Based on statements that the federal prosecutor made to the District Court at Watford's sentencing, Watford accuses state and federal authorities of having entered into a "cabal" for the purpose of obtaining federal "backup time" as a hedge against any potential adverse ruling by an Illinois appeals court. He characterizes this "cynical strategy" as "the essence of the 'bad faith delay'" discussed by the Supreme Court in *Doggett*. (Appellant's Br. 26; Appellant's Reply Br. 4.)

---

[5] An additional one month elapsed before Watford was presented for arraignment in the Western District of Kentucky on April 20, 2004. Given the security arrangements attendant in the interstate transportation of a capital inmate, and because Watford's counsel conceded at oral argument that this one-month period was "normal," we consider only the delay *before* the issuance of the writ of *habeas corpus ad prosequendum*.

The Supreme Court in *Doggett* explained that a "bad faith delay" is one in which the prosecution uses delay to "gain some impermissible advantage at trial." 505 U.S. at 656. That has not happened here. Even if we credit Watford's insistence that federal authorities prosecuted this case solely to obtain federal "backup time," we do not think that this falls outside the bounds of prosecutorial discretion. The hallmarks of impermissible prosecutorial vindictiveness are simply not present here, where the record shows that the Government did nothing more than prosecute already-pending federal charges against a convicted murderer when it appeared that, for reasons outside the Government's control, the prior murder conviction might be in jeopardy. *Cf. Blackledge v. Perry*, 417 U.S. 21, 28-29 (1974) (finding circumstantial evidence of prosecutorial vindictiveness where prosecutor substituted more serious charges for the original charges following the accused's exercise of a procedural right).

Other courts have recognized that a prosecutor may consider the outcome of a prior criminal proceeding when deciding whether to bring new charges. *See United States v. Rodgers*, 18 F.3d 1425, 1431 (8th Cir. 1994) (holding that prosecutor properly may consider outcome of prior criminal prosecution when deciding whether to bring additional charges, where new charges are not punishment for exercise of a legal right but for crimes committed); *United States v. Esposito*, 968 F.2d 300, 304 (3d Cir. 1992) (same). Our own caselaw supports the same proposition.

> "[I]f the government must prosecute the defendant without knowing what his punishment will be at the state level, it will be unable to consider the state's punishment in determining what charges to bring [—if any at all—as well as what punishment to seek] to make the totality of the state and federal convictions [and punishments] commensurate with the crime."

*Schreane*, 331 F.3d at 555 (quoting *Thomas*, 55 F.3d at 150 n.6). Therefore, we conclude that even if the Government's sole reason for proceeding with its prosecution of the already-pending charges against Watford was to obtain federal "backup time," this alone would not have constituted an impermissible or vindictive tactic. Nor would it suggest, without more, that the 18-month delay between Watford's state sentencing and issuance of the writ of *habeas corpus ad prosequendum* was designed to hamper Watford's defense. *See Barker*, 407 U.S. at 531; *see also Greene*, 737 F.2d at 574 (stating that speedy trial claimant has burden of showing that "delay was an intentional device by the government to gain a tactical advantage" (internal quotation marks omitted)) .

Although the 18-month delay following Watford's state sentencing does not suggest prosecutorial bad faith, we must still determine whether this delay was the result of some "more neutral" failing on the part of the Government, *see Barker*, 407 U.S. at 531, or whether in fact it was justified by valid practical considerations. The Government's failure to explain this delay in its appellate brief tempts us to conclude that the delay lacks a valid justification. Such an unjustified delay, while not rising to the level of bad faith, would nevertheless suggest a "more neutral" reason, such as negligence, for which the Government bore ultimate responsibility. *See Wilson*, 250 F.3d at 395 (noting that the relevant inquiry is "who 'is more to blame for th[e] delay'" (quoting *Doggett*, 505 U.S. at 651)). Under such circumstances, we would be compelled to weigh this delay against the Government. *Barker*, 407 U.S. at 531.

We think, however, that a careful reading of the record suggests another, more plausible reason for the 18-month delay. Neither party disputes that during this 18-month period, Watford was appealing his state conviction. At the same time, the Illinois Attorney General had undertaken the extraordinary measure of petitioning the Illinois Supreme Court for a writ of mandamus ordering the Illinois Director of Corrections to prevent the recording of commutation orders for certain inmates, including Watford, who had failed to sign or consent to their clemency petitions. (*See* J.A. at 46.) *See also Snyder*, 804 N.E.2d at 550-51. While these two appellate actions were pending, and in the wake of Governor Ryan's unprecedented *sua sponte* blanket commutation, we think that

federal prosecutors reasonably could have decided to await a conclusive outcome in the state courts before determining whether to resume their federal prosecution. Indeed, less than one month after the Illinois Supreme Court denied the petition for writ of mandamus on January 23, 2004, federal prosecutors sought and obtained a Superseding Indictment against Watford.[6] Given the extraordinary appellate proceedings that followed the commutation of Watford's state conviction and sentencing, we conclude that the Government's 18-month delay before seeking a writ of *habeas corpus ad prosequendum* was justified.

We stress that our holding reflects the unique circumstances of this case, and should not be construed as a broad license for prosecutors to hold federal charges in abeyance whenever an accused has ongoing appellate proceedings in another jurisdiction. Nor do we sanction the "warehousing" of claims against an accused for extended periods of time, to be prosecuted if and when it becomes expedient to do so. However, accepting the Government's representation that it could not justify prosecuting a defendant already awaiting execution, we find that when Watford's capital sentence was commuted, and when the commutation itself was later contested by way of mandamus, the Government's decision to await a definitive outcome in the state courts before resuming its prosecution should not be deemed negligent. Accordingly, we decline to weigh the 18-month delay between Watford's state sentencing and the issuance of the writ of *habeas corpus ad prosequendum* against the Government.

In summary, we find that the 69-month period between Watford's arrest and federal arraignment was justified by strong considerations that weigh decidedly in favor of the Government. We decline, under the exceptional circumstances of this case, to announce a holding that would characterize the Government's delay as being in bad faith, or otherwise to assign blame to the Government for failing to prosecute its case sooner.

### 3.        Whether Watford Asserted His Sixth Amendment Rights

There is no dispute that Watford first asserted his Sixth Amendment right to a speedy trial on September 10, 2004, approximately 74 months after his federal indictment. Watford claims to have been unaware that he was under federal indictment during the time he was standing trial in Illinois. The Government rejects this argument as lacking credibility, pointing out that an arrest warrant and detainer had been placed on Watford and that forfeiture proceedings had been successfully prosecuted against the monies seized from Watford's person and apartment on the day of his arrest.

The District Court found that a federal detainer had been placed on Watford while he was appealing his state conviction and while the State of Illinois was appealing Governor Ryan's commutation. (*See* J.A. at 56.) This finding suggests that a detainer was placed on Watford sometime in 2003, although the record contains no independent corroboration of this occurrence. The District Court's docket report does show that a federal magistrate judge issued a warrant for Watford's arrest on July 22, 1998, the day Watford was indicted, but it does not indicate that this warrant was ever lodged with Illinois authorities as a detainer. In denying Watford's motion to dismiss on speedy trial grounds, the District Court resolved the third *Barker* factor against Watford by placing exclusive emphasis on the existence of a federal detainer. (J.A. at 57.)

Applying the deferential "clearly erroneous" standard, we affirm the District Court's finding that sometime in or about 2003, a federal detainer was lodged with Illinois officials. The record contains no evidence to contradict this finding. *See Wilson*, 250 F.3d at 395 (presuming district

---

[6]At least one of our sister circuits, in the context of a claim under the Speedy Trial Act, has excused pretrial delay where a defendant is incarcerated pending appeal in another proceeding and has failed to post an appeal bond. *See United States v. O'Bryant*, 775 F.2d 1528, 1532 (11th Cir. 1985).

court's finding was correct where defendant failed to adduce "clear and convincing evidence that contradicted the trial court's factual determination"). It does not follow, however, that Watford necessarily had knowledge of the detainer. In *Schreane*, while the defendant was in state custody on state charges, federal authorities lodged a detainer with state officials and instructed them to provide a copy of the detainer to the defendant. After the defendant pled guilty to the state charges, federal authorities lodged a second detainer against the defendant; the record contained evidence that the defendant was personally served with the second detainer. Later, after moving to dismiss on speedy trial grounds, the defendant argued that he was unaware of the first detainer. Reviewing the district court's denial of the defendant's motion to dismiss, the Sixth Circuit found that the government had failed to prove that the defendant had knowledge of the first detainer, and that the defendant could not be blamed for failing to assert his speedy trial rights prior to the second detainer. *Schreane*, 331 F.3d at 557. In the absence of a District Court finding that Watford had knowledge of the federal detainer, and absent record evidence of such knowledge, we conclude that Watford is not to blame for failing to assert his speedy trial rights despite the detainer. *See id.*

The Government also suggests that the federal forfeiture proceedings must have alerted Watford to the federal charges against him. Several docket entries in January, May, and June 1999 do indeed relate to forfeiture, although it is unclear whether these entries relate to monies seized from Watford or Hale. Nor is there evidence that Watford had notice of these proceedings. The only definitive evidence in the record of Watford receiving actual notice of the federal charges is the execution of the writ of *habeas corpus ad prosequendum* on April 20, 2004. Therefore, we conclude that the Government has failed to prove that Watford had knowledge of the federal charges against him prior to execution of the writ of *habeas corpus ad prosequendum*, and we will not penalize Watford failing to assert his speedy trial rights before April 20, 2004. *See Mundt*, 29 F.3d at 236 (holding that failure to assert right to speedy trial cannot be held against defendant where record contains no evidence that defendant knew of indictment); *accord Barker*, 407 U.S. at 525-26 ("Courts should indulge every reasonable presumption against waiver, and they should not presume acquiescence in the loss of fundamental rights." (internal quotation marks omitted)).

The record shows that Watford first asserted his speedy trial rights in a motion to dismiss filed on September 10, 2004, nearly five months after execution of the writ of *habeas corpus ad prosequendum*. Watford offers no explanation for his delay, despite having been represented by counsel after the April 20, 2004 arraignment. In *Schreane*, the Sixth Circuit held that the defendant's unexplained four-month and three-week delay in asserting his speedy trial rights after being served with the second federal detainer weighed against him. 331 F.3d at 557. Following the example of *Schreane*, we find that Watford's nearly five-month delay in asserting his speedy trial rights weighs against him. *See United States v. Thomas*, 167 F.3d 299, 305 (6th Cir. 1999) ("A defendant's failure to assert his rights in a timely fashion weighs heavily against his Sixth Amendment claim.").

Finally, we must consider Watford's delay in the context of the overall delay. The weight we assign to Watford's delay in asserting his Sixth Amendment rights "is proportional to the tardiness at issue, which is but a portion of the total delay." *Schreane*, 331 F.3d at 557. In *Schreane*, faced with similar circumstances, this Court weighed the third *Barker* factor against the defendant. *See id.* at 557, 559. We find, therefore, that the third *Barker* factor weighs against Watford and favors the Government.

### 4. Prejudice to Watford

The final criterion we must consider is whether Watford suffered prejudice from the pretrial delay. In conducting this inquiry, we must heed the Supreme Court's instruction to consider the possible prejudice suffered by the defendant in light of the interests safeguarded by the Sixth Amendment's speedy trial guarantee. *Barker*, 407 U.S. at 532; *Norris v. Schotten*, 146 F.3d 314,

328 (6th Cir. 1998). Three interests are paramount: (i) preventing oppressive pretrial incarceration; (ii) minimizing the anxiety and concern of the accused; and (iii) limiting the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532; *Norris*, 146 F.3d at 328. Impairment of the defense is the most important concern "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532; *Schreane*, 331 F.3d at 557-58.

In denying Watford's motion to dismiss on speedy trial grounds, the District Court found that the Government's delay had not offended any of these interests. First, because Watford was already incarcerated on state murder charges, he had suffered no oppressive pretrial incarceration at the hands of federal authorities. Second, any anxiety or concern that Watford experienced during his pretrial delay undoubtedly was attributable to his trial and conviction for capital murder, rather than the pending federal charges. Lastly, Watford proffered no evidence or argument that his defense was impaired by the Government's delay. Thus, the District Court concluded that any prejudice that Watford may have suffered was minimal. On appeal, Watford relies on the same arguments that the District Court rejected. We conclude, for the same reasons articulated by the District Court, that Watford suffered minimal prejudice as a result of the pre-arraignment delay.

Watford argues that this factor should weigh in his favor because the lengthy pretrial delay was "presumptively prejudicial." (Appellant's Br. 27.) However, in *United States v. Howard*, 218 F.3d 556 (6th Cir. 2000), we rejected such a bright-line rule. There, we emphasized that a defendant is not presumed prejudiced whenever his or her trial is delayed, because some delays are "'both inevitable and wholly justifiable.'" *Id.* at 564 (quoting *Doggett*, 505 U.S. at 656). We stated that "[w]hen the government prosecutes a case with reasonable diligence, a defendant who cannot demonstrate how his defense was prejudiced with specificity will not make out a speedy trial claim no matter how great the ensuing delay." *Id.* Where delay was the result of negligence, we required a higher threshold for defendants who do not suffer particularized trial prejudice as compared to those who do. *Id.* at 564-65.

Watford has failed to adduce any evidence of particularized trial prejudice. Moreover, as discussed above, the Government has sufficiently accounted for its pre-arraignment delay. Under these circumstances, we find that whereas the length of the pre-arraignment delay may have given rise to a threshold presumption of prejudice sufficient to warrant consideration of the remaining *Barker* factors, Watford failed to sustain this presumption by adducing evidence of particularized trial prejudice. Accordingly, this factor weighs in favor of the Government.

In summary, only the first *Barker* factor weighs decidedly in Watford's favor, while the second, third, and fourth factors favor the Government. Upon balancing these factors, we conclude that the pre-arraignment delay did not deprive Watford of his Sixth Amendment right to a speedy trial.

### B. *Statute of Limitations*

Watford next argues that the period between the date of the criminal act charged in Count 2 of the original Indictment (July 8, 1998) and the date the Third Superseding Indictment was returned (January 19, 2005) exceeds the five-year statute of limitations provided under 18 U.S.C. § 3282. He concedes that the original July 22, 1998 Indictment was returned well within the statute of limitations, which would have expired on July 8, 2003, but argues that the superseding indictments broadened the charges against him. Consequently, he insists, the Third Superseding Indictment should not relate back to July 22, 1998, and Count 2 should have been dismissed.

We review *de novo* a district court's denial of a motion to dismiss an indictment on statute of limitations grounds. *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 589 (6th Cir. 2001).

It is well established that "as long as [a] superseding indictment does not broaden the original indictment, the superseding indictment relates back to the filing of the original indictment even if the superseding indictment is filed outside of the statute of limitations." *United States v. Smith*, 197 F.3d 225, 228 (6th Cir. 1999) (citing *United States v. Grady*, 544 F.2d 598, 601-02 (2d Cir. 1976)). An indictment is broadened "when the government, the court, or both, broadens the possible bases for conviction beyond those presented by the grand jury." *United States v. Duran*, 407 F.3d 828, 842 (7th Cir. 2005) (internal quotation marks omitted); *see also United States v. Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003) (discussing broadening of indictment where superseding indictment "expose[s] the defendant to a potentially greater sentence"). In determining whether a superseding indictment broadens the charges in the original indictment, the touchstone is whether the original indictment provided notice of the charges such that the defendant can adequately prepare his or her defense. *Smith*, 197 F.3d at 229.

Count 2 of the original indictment charged that Watford and Hale knowingly and intentionally possessed with intent to distribute an undisclosed quantity of "cocaine base, known as 'crack,' . . . [i]n violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2." (J.A. at 20.) After the Supreme Court's decisions in *Apprendi* and *Blakely*, the Government sought superseding indictments on February 8, 2004, January 5, 2005, and January 19, 2005. Count 2 of the January 19, 2005 Third Superseding Indictment charged Watford and Hale with knowingly and intentionally possessing with intent to distribute "approximately 1.5 kilograms or more of a mixture or substance containing a detectible amount of cocaine base, commonly known as 'crack' cocaine." The superseding Count 2 further charged that Watford and Hale acted "[i]n violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(A)(iii) and Title 18, United States Code, Section 2." (J.A. at 67.) We must consider whether the Third Superseding Indictment's specification of a drug quantity, as well as its addition of an express reference to 21 U.S.C. § 841(b)(A)(iii), constitute a broadening of the charges against Watford. This in turn requires us to consider whether the original Indictment afforded Watford sufficient notice of the charge as ultimately expressed in Count 2 of the Third Superseding Indictment.

Both of the amendments to Count 2 relate to the Government's addition of a drug quantity in response to the Supreme Court's decisions in *Apprendi* and *Blakely*. We considered precisely this practice in *United States v. Garcia*, 268 F.3d 407 (6th Cir. 2001), *overruled on other grounds*, *United States v. Leachman*, 309 F.3d 377 (6th Cir. 2002). There, we found that "the change in the legal landscape created by the *Apprendi* decision" called for "a more flexible approach" than simply comparing the language of the original and superseding indictments. *Id.* at 415. We found that the pre-*Apprendi* indictment did not contain any allegation of a specific drug quantity whereas the post-*Apprendi* superseding indictment did. However, we also found that the defendants had received written notice of the drug quantity when, shortly after the original indictment, they received a Notice of Enhanced Penalty indicating the drug quantity, and an acknowledgment of indictment form showing the applicable sentencing range. Accordingly, we held that because the defendants knew from the outset the quantity of drugs the government intended to prove, the superseding indictment related back to the earlier indictment. *Id.* at 415-16; *see also United States v. Walls*, 148 F. App'x 286, 289-90 (6th Cir. 2005) (finding that addition of "5 kilograms or more" of cocaine did not improperly broaden original charge).

Here, as in *Garcia*, the "unusual circumstances" created by the *Apprendi* decision warrant a "flexible approach" to determining whether Count 2 of the Third Superseding Indictment broadened the analogous count in the original Indictment. *Garcia*, 268 F.3d at 415. At the time of the original indictment, the version of § 841(a)(1) in effect stated, "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally--(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1) (Supp. 1998). It did not refer to any specific "controlled substance" by name. Significantly, however, the original Indictment charged Watford with

possessing "cocaine base, known as 'crack'." (J.A. at 20.) Even more significantly, the Notice filed with the original Indictment clearly stated that Count 2 carried a potential term of imprisonment of not less than ten years and not more than life, a potential fine of $4,000,000, and a potential term of supervised release of not less than five years. (J.A. at 25.)

A sentence of ten years to life for possession of crack cocaine, coupled with a fine of $4,000,000 and a term of supervised release not less than five years, is possible only under § 841(b)(1)(A)(iii). The version of § 841(b)(1)(A)(iii) in effect in 1998 provided that a violation of § 841(a) involving "50 grams or more of a mixture or substance described in clause (ii) which contains cocaine base" shall be punishable by a term of imprisonment of ten years to life, or 20 years to life if the defendant had previously been convicted of a felony drug offense. 21 U.S.C. § 841(b)(1)(A)(iii) (Supp. 1998). It carried a potential fine of $4,000,000 and required a sentencing court to "impose a term of supervised release of at least 5 years" in addition to the term of incarceration. *Id.* Although a parallel provision, § 841(b)(1)(B)(iii), provided that a violation of § 841(a) involving "5 grams or more of a mixture or substance described in clause (ii) which contains cocaine base" shall be subject to an enhanced term of incarceration of ten years to life and an enhanced fine of $4,000,000 if the defendant had previously been convicted of a felony drug offense, the corresponding enhanced term of supervised release was "at least 8 years." This latter provision is plainly inconsistent with the applicable five-year term of supervised release noticed in the original Indictment. Therefore, the applicable penalties shown in the Notice accompanying the original Indictment unambiguously signaled the Government's intention to prosecute Count 2 under § 841(b)(1)(A)(iii). By extension, Watford was on notice that the Government intended to prove that Watford possessed "50 grams or more" of crack cocaine.

Watford argues that the Third Superseding Indictment increased Watford's potential term of incarceration to not less than 20 years and not more than life. (*See* J.A. at 69.) While the Notice accompanying the Third Superseding Indictment does indeed reflect an apparent increase in the applicable penalty, this increase is attributable to the enhanced penalty provision of § 841(b)(1)(A)(iii), which provides for a doubling of all applicable penalties if the defendant had been convicted of a prior drug felony. The original Indictment's failure to give notice of the enhanced penalties does not signify that the enhanced penalties reflected in Third Superseding Indictment constitute a broadening of the charges against Watford. Under 21 U.S.C. § 851, the Government provides notice of its intent to seek enhanced penalties, not in the indictment, but in an information filed separately by the United States Attorney with the trial court before the defendant's trial or guilty plea. *See* 21 U.S.C. § 851(a)(1).

Therefore, employing the "flexible approach" discussed in *Garcia*, we conclude that the original Indictment placed Watford on notice of the charges against him and the potential penalties he faced. At the time of Watford's arrest, he was in possession of over 40 grams of crack cocaine, while his apartment contained approximately 300 grams of crack cocaine. As the Government argues, and as the District Court found, this drug quantity has remained constant throughout these proceedings. No new drug quantities, and no new charges, have been added. Under these circumstances, it is evident that the Third Superseding Indictment did not broaden Count 2, and that the District Court did not err in denying Watford's motion to dismiss on statute of limitations grounds.

## C.          *Prosecutor's Discretion under 21 U.S.C. § 851*

Watford's next argument on appeal is that the discretion afforded the prosecutor under 21 U.S.C. § 851 to seek an enhanced sentence based upon the defendant's prior record is an unconstitutional delegation by Congress to the Executive. Specifically, Watford argues that the United States Attorney had sole and unreviewable discretion to seek a sentence in the range of 180 to 312 months, or, based upon Watford's prior drug conviction, to file an information under § 851

and seek a sentence in the range of 300 to 312 months. This discretion, Watford argues, runs afoul of Congress's exclusive legislative power to define sentences for crimes.

We exercise *de novo* review of a criminal defendant's challenge to his sentence on constitutional grounds. *United States v. Lloyd*, 10 F.3d 1197, 1220 (6th Cir. 1993). The Sixth Circuit has already considered and rejected this precise challenge. In *United States v. Crayton*, 357 F.3d 560 (6th Cir. 2004), the defendant argued that § 851 violates separation of powers by vesting United States Attorneys with unfettered discretion to seek enhanced sentences. Citing *United States v. LaBonte*, 520 U.S. 751 (1997), in which the Supreme Court analogized prosecutorial discretion under § 851 to the Executive's inherent power to charge criminal defendants, we held that § 851 did not constitute an unconstitutional delegation of legislative authority. *Crayton*, 357 F.3d at 572; *see also United States v. Jensen*, 425 F.3d 698, 707 (9th Cir. 2005) (holding same); *United States v. Cespedes*, 151 F.3d 1329, 1333 n.1 (11th Cir. 1998) (same); *United States v. Moody*, 30 F. App'x 58, 61 (4th Cir. 2002) (same). We find no reason to revisit this holding. A prosecutor's discretion under 21 U.S.C. § 851 does not violate the separation of powers doctrine.

### D.          *Government's Peremptory Strikes of Jurors 271 and 298*

Next, Watford argues that during voir dire, the Government used peremptory challenges to strike two African-Americans from the venire, leaving an all-white jury. Watford, who is an African-American, contends that the Government's peremptory strikes deprived him of his rights under *Batson v. Kentucky*, 476 U.S. 79 (1986). The Government responds that the District Court correctly found no evidence of purposeful discrimination in the Government's peremptory strikes.

The federal government's use of peremptory challenges in a criminal case to exclude members of a venire from serving on a petit jury solely because of their race violates the accused's Sixth Amendment right to an impartial jury and Fourteenth Amendment right to equal protection of the laws. *Id.* at 89; *United States v. Mosely*, 810 F.2d 93, 96 (6th Cir. 1987). In the context of deciding a *Batson* challenge, a district court's ruling as to discriminatory intent is a finding of fact. *Paschal v. Flagstar Bank*, 295 F.3d 565, 574 (6th Cir. 2002) (quoting *United States v. Mahan*, 190 F.3d 416, 423 (6th Cir. 1999)). Accordingly, we review a district court's application of *Batson* for clear error, giving "great deference" to the lower court's findings. *United States v. Copeland*, 321 F.3d 582, 599 (6th Cir. 2003).

Under *Batson*, the opponent of a peremptory strike makes out a prima facie case of purposeful discrimination by proving (1) that he or she is a member of a cognizable racial group, (2) that the proponent of the strike has used peremptory challenges to remove from the venire members of the strike opponent's race, and (3) that the relevant circumstances raise an inference that the proponent of the strike excluded prospective jurors from the petit jury because of their race. 476 U.S. at 96; *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999). Once the opponent of the strike has established a prima facie case, the burden shifts to the strike proponent to come forward with a neutral explanation for his or her use of peremptory challenges. *Id.* at 97; *Paschal*, 295 F.3d at 574. Finally, if the proponent of the strike has come forward with a race-neutral explanation, "'the district court has the responsibility to assess the [strike proponent's] credibility under all of the pertinent circumstances, and then to weigh the asserted justification against the strength of the [strike opponent's] prima facie case under the totality of circumstances.'" *Paschal*, 295 F.3d at 574 (quoting *Mahan*, 190 F.3d at 425).

Although the District Court did not expressly find that Watford made out a prima facie case of purposeful discrimination, the record shows that the District Court did consider the Government's proffered race-neutral explanations for its peremptory strikes. Therefore, it is clear that Watford has made out a prima facie case of purposeful discrimination. First, there is no dispute that Watford is a member of a cognizable racial group. Second, it is undisputed that of the 31 prospective jurors

pulled from the wheel to hear Watford's case, the Government used peremptory challenges to strike the only two African-Americans in the venire. Finally, these facts, and the other relevant circumstances, raise the inference that the Government used its peremptory challenges to exclude African-American prospective jurors from the petit jury. *See Paschal*, 295 F.3d at 575 (accepting, without discussion, the district court's conclusion that plaintiffs made out a prima facie case of purposeful discrimination where plaintiff used peremptory challenge to strike the only African-American out of 17 prospective jurors).

During voir dire, the District Court considered the Government's proffered race-neutral explanations. With respect to juror 271, the Government represented that it exercised its peremptory challenge because the juror had a rap sheet. With respect to juror 298, the Government admitted that it exercised its peremptory challenge in error, and that the sheet from which the prosecutor was working during voir dire erroneously listed the juror as white. The Government also noted that juror 298 had a family history of drug use. In *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995), the Supreme Court explained that the strike proponent's race-neutral explanation need not be persuasive or even plausible. "Unless a discriminatory intent is inherent in the [strike proponent's] explanation, the reason offered will be deemed race neutral." *Id.* at 768; *United States v. McFerron*, 163 F.3d 952, 955 (6th Cir. 1998). Under this lenient standard, we find that the Government's proffered explanations for exercising its peremptory challenges were race neutral and satisfied the second prong of the *Batson* test. *See United States v. Forrest*, 402 F.3d 678, 687 (6th Cir. 2005) (affirming district court's finding that government had proffered a race-neural explanation for exercising peremptory strike of prospective juror who had a record of criminal charges); *see also Hurd v. Pittsburg State Univ.*, 109 F.3d 1540, 1546-47 (10th Cir. 1997) (finding that a proffered race-neutral explanation for peremptory strike based solely on strike proponent's mistaken belief satisfied the second prong of *Batson* analysis), *abrogated on other grounds by Migneault v. Peck*, 204 F.3d 1003 (10th Cir. 2000).

The dissent argues that a mistaken belief will not satisfy the second prong of a *Batson* analysis where the peremptory strike appears to be racially based. Because a court reaches the second *Batson* prong only after finding an inference of purposeful discrimination under the first prong, *see Batson*, 476 U.S. at 96-97, the dissent appears to take the position that a strike proponent's mistaken belief, standing alone, can never overcome the inference of purposeful discrimination. It is the dissent who is mistaken. As we explained in *McFerron*, when the Supreme Court "established the requirement that the proponent of a strike give a 'clear and reasonably specific' explanation of the legitimate reasons for exercising a peremptory challenge, it was not requiring 'a reason that makes sense, but a reason that does not deny equal protection.'" 163 F.3d at 955 (internal citation omitted) (quoting *Batson*, 476 U.S. at 98 n.20 and *Purkett*, 514 U.S. at 769). Thus, discriminatory intent must be *inherent* in the proffered explanation for it to fail the second prong of the *Batson* analysis. *Purkett*, 514 U.S. at 768.

Here, the prosecutor represented that during voir dire, he placed a question mark on the list next to juror 298, but later could not recall his reason for doing so. The record shows that the prosecutor represented that he struck juror 298 because of the question mark (*see* J.A. at 202 ("I had a question mark by him for reasons unknown to me, so I struck the juror, struck in error.")), and that he did not know that juror 298 was an African-American (*id.* ("I didn't know 298 was black.")). It is not our responsibility at this stage to pass judgment on the persuasiveness of these representations. *McFerron*, 163 F.3d at 955. Our sole responsibility is to determine whether this explanation is race-neutral. *Harris*, 192 F.3d at 586 (referring to the government's "extremely light burden" to show a "proffered reason [that] need not be particularly persuasive, or even plausible, so long as it is neutral"). Where the prosecutor has represented that he did not know juror 298 was an African-American, we are hard-pressed, on the record before us, to find discriminatory intent inherent in the proffered explanation. *See United States v. Yang*, 281 F.3d 534, 549 (6th Cir. 2002) ("[T]he

explanation must simply be one in which discriminatory intent is not inherent."). Accordingly, we conclude that the Government has satisfied the second prong of the *Batson* analysis.

Finally, we must determine whether the District Court committed clear error in deciding the ultimate question of discriminatory intent in favor of the Government. Under *Batson*, the opponent of the strike bears the ultimate burden of proving purposeful discrimination. *Purkett*, 514 U.S. at 768; *United States v. Jackson*, 347 F.3d 598, 604 (6th Cir. 2003). In determining whether the strike opponent has carried this burden, the district court should consider the totality of the circumstances surrounding the strike. *United States v. Hill*, 146 F.3d 337, 342 (6th Cir. 1998). Here, there appears to be little dispute concerning the Government's peremptory strike of juror 271 for having a rap sheet. During voir dire, in support of its asserted justification, the Government noted that it also struck juror 8, a white woman, for the same reason. No other prospective jurors had rap sheets. (J.A. at 201.) The District Court accepted the Government's justification, and Watford does not specifically challenge this strike on appeal. Therefore, giving "great deference" to the District Court, we hold that the District Court's finding of no purposeful discrimination was not clearly erroneous.

With respect to the Government's peremptory strike of juror 298, Watford challenges the credibility of the prosecutor's assertion that he mistakenly believed the prospective juror was white. Watford argues that, notwithstanding any error on the prosecutor's list of prospective jurors, the prosecutor must have known that juror 298 was black because *"the juror was clearly African-American, and the prosecutor . . . stood right next to him during a bench conference*!" (Appellant's Br. 45 (emphasis in original).) We must admit that this argument accords with common sense and raises suspicion. Nevertheless, to reverse the District Court on these grounds would require us to find (i) that juror 298 was "clearly African-American," (ii) that the prosecutor saw and identified juror 298, (iii) that the prosecutor struck juror 298 because of his race, and (iv) that the District Court committed clear error in ruling in favor of the Government despite these facts. We decline to do so.

Appellate review of a district court's *Batson* finding must accord great deference to the district court's credibility determinations. As the Supreme Court has observed,

> the critical question in determining whether a prisoner has proved purposeful discrimination at step three [of the *Batson* analysis] is the persuasiveness of the prosecutor's justification for his peremptory strike. At this stage, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.

*Miller-El v. Cockrell*, 537 U.S. 322, 338-39 (2003) (internal citation omitted). Because the question turns on credibility, "the best evidence often will be the demeanor of the attorney who exercises the challenge." *Id.* at 339. For this reason, "evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Id.* (citing *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)). An appellate court, confined to reviewing transcripts from voir dire, "is not as well positioned as the trial court is to make credibility determinations." *Id.*

With this guidance in mind, it is clear that we must affirm the District Court's *Batson* ruling with respect to juror 298. The record shows that, having observed voir dire and the challenged strike firsthand, having heard Watford's counsel's *Batson* objection and the prosecutor's proffered justification, and having examined the prosecutor's list erroneously showing juror 298 as white, the

District Court accepted the Government's representation of honest mistake. (J.A. at 205 ("[I]t appears that this is not a concocted story or an untruth. It appears to be true . . . ."); 206 ("I don't think there's a pretext here. This appears to be a legitimate mistake.").) Nothing in the appellate record suggests that this finding was clearly erroneous. Therefore, to reverse the District Court would require this Court to give greater weight to inferences and assumptions drawn from the cold appellate record concerning what the prosecutor must have known, than to specific credibility determinations made by the District Court during voir dire with the benefit of firsthand observation. *See United States v. Gibbs*, 182 F.3d 408, 440 (6th Cir. 1999) (affirming the district court's overruling of *Batson* challenge where prosecutor was unaware that stricken jurors were African-American). We affirm the District Court.

### E. *Twenty-Year Mandatory Sentence on Basis of Prior Drug Conviction*

Watford contends that the 20-year mandatory sentence of 21 U.S.C. § 841(b)(1)(A)(iii) is unconstitutional on its face and as applied by the District Court. Specifically, Watford argues that the fact of his prior drug conviction was neither admitted nor proven to the jury beyond a reasonable doubt, and that its use in increasing his sentencing range violates the Sixth Amendment, as recognized in *Apprendi*. He characterizes contrary Supreme Court precedent as "most likely ready to be overruled." (Appellant's Br. 47.) *See Harris v. United States*, 536 U.S. 545 (2002); *Almendarez-Torres v. United States*, 523 U.S. 224 (1998).

We review a criminal defendant's constitutional challenge to his sentence *de novo*, and we review the district court's underlying factual determinations under the "clearly erroneous" standard. *United States v. Henderson*, 209 F.3d 614, 617 (6th Cir. 2000); *Lloyd*, 10 F.3d at 1220. Watford's argument has no merit. In *Apprendi*, the Supreme Court held that "[o]*ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490 (emphasis added); *see also United States v. Booker*, 543 U.S. 220, 244 (2005) (reaffirming same). Although at least one Supreme Court Justice has since criticized the prior conviction exception to the Sixth Amendment, *see Shepard v. United States*, 544 U.S. 13, 28 (2005) (Thomas, J., concurring in part and concurring in the judgment), this Court continues to recognize its viability. *See, e.g.*, *United States v. Barnett*, 398 F.3d 516, 524-25 (6th Cir. 2005). We are bound by the Supreme Court's statements in *Apprendi* and *Booker* until and unless they are revised by the Supreme Court. Therefore, we reject Watford's argument as meritless.

### F. *District Court's Discretion to Impose a Consecutive Sentence*

Watford argues that the District Court erred in imposing the 240-month sentence on Count 2 of the Third Superseding Indictment to run consecutively to his three life terms in Illinois. He urges this Court to find that the District Court's sentence was not "reasonable" under *Booker*. Because the alleged unreasonableness arises from the District Court's decision to impose a sentence running consecutive to, rather than concurrent with, the undischarged Illinois sentence, we review the District Court's decision for abuse of discretion. *United States v. Campbell*, 309 F.3d 928, 930 (6th Cir. 2002) ("A district court's decision to impose a consecutive or concurrent sentence under § 5G1.3 of the Sentencing Guidelines is reviewed for abuse of discretion.").

When imposing a term of imprisonment on a defendant who is already subject to an undischarged term of imprisonment, a district court generally may order that the terms run either concurrently or consecutively. 18 U.S.C. § 3584. The advisory Guidelines are consistent on this point. Section 5G1.3(c) provides that "the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." U.S.S.G. § 5G1.3(c)

(1997) (policy statement).**7**  Application Note 3 provides further guidance for what is needed to achieve a "reasonable punishment."

> To achieve a reasonable punishment and avoid unwarranted disparity, the court should consider the factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a)) and be cognizant of:
> (a) the type (*e.g.*, determinate, indeterminate/parolable) and length of the prior undischarged sentence;
> (b) the time served on the undischarged sentence and the time likely to be served before release;
> (c) the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and
> (d) any other circumstances relevant to the determination of an appropriate sentence for the instant offense.

U.S.S.G. § 5G1.3 application note 3 (1997). We have held that where a district court has considered the factors listed in 18 U.S.C. § 3553(a) and the applicable guidelines and policy statements in effect at the time of sentencing, the district court's decision whether to impose a concurrent or consecutive sentence pursuant to § 5G1.3 is discretionary. *United States v. Covert*, 117 F.3d 940, 945 (6th Cir. 1997). "Where . . . the court makes generally clear the rationale under which it has imposed the consecutive sentence and seeks to ensure an appropriate incremental penalty for the instant offense, it does not abuse its discretion." *United States v. Owens*, 159 F.3d 221, 230 (6th Cir. 1998).

The record reflects that the District Court made brief reference to the statutory and Guidelines factors before ordering that Watford's federal sentence run consecutive to the undischarged state sentence.

> I've considered the guideline guidance in 5G1.3(c) and the factors set forth in the commentary, as well as 3584 of Title 18 and 3553(c) – 3553(a), which is also relevant to the determinations. The conduct in this case has absolutely nothing to do with anything that happened in Illinois. That happened previously, and I think that even though he is currently facing a sentence of life in the State of Illinois on the governor's commutation of the sentence of death, that the conduct in this case stands apart and is separable factually, temporally and in any other fashion, other than it is certainly part of a long and continual criminal record on the part of the defendant and has no relationship to any of those counts.

(J.A. at 314.) Although this Court generally requires that district courts give more than mere lip service to the § 3553 factors, *United States v. Jackson*, 408 F.3d 301, 305 (6th Cir. 2005), we have also said that a district court need not "'engage in a ritualistic incantation of the § 3553(a) factors it considers.'" *United States v. McBride*, 434 F.3d 470, 474 (6th Cir. 2006) (quoting *United States v. Chandler*, 419 F.3d 484, 488 (6th Cir. 2005)); *see also Campbell*, 309 F.3d at 931 ("A district court, however, is not required to make specific findings related to each factor considered; rather, the district court need only 'articulate . . . enough of its reasoning to permit an informed appellate review.'" (quoting *United States v. McClellan*, 164 F.3d 308, 310 (6th Cir. 1999))). A district court's sentencing opinion should be sufficiently detailed to reflect the considerations listed in § 3553(a). *United States v. Jones*, 445 F.3d 865, 869 (6th Cir. 2006); *McBride*, 434 F.3d at 474.

---

**7**The District Court applied the Guidelines in effect at the time of the offense rather than those in effect at the time of sentencing to avoid *ex post facto* application of the law.

The District Court's reasoning for imposing a consecutive sentence, while somewhat cursory, does not constitute an abuse of discretion. From the record, it is clear that the District Court considered the recommendations of the Guidelines and the pertinent policy statement. *See* 18 U.S.C. § 3553(a)(4) & (5) (requiring consideration of recommended sentencing range and pertinent policy statements); U.S.S.G. § 5G1.3(c) (policy statement); *see also United States v. Williams*, 432 F.3d 621, 623-24 (6th Cir. 2005) (noting the significance of the district court's reliance on pertinent policy statements). The District Court's reference to 18 U.S.C. § 3584 also indicates that the court understood that it could impose either a concurrent or consecutive sentence. *See* 18 U.S.C. § 3553(a)(3) (requiring consideration of the "kinds of sentences available"). Finally, the District Court's recognition of the separate and distinct nature of the Illinois offense, as well as Watford's "long and continual criminal record" (J.A. at 314), indicates that the court considered the "nature and circumstances of the offense and the history and characteristics of the defendant." *See* 18 U.S.C. § 3553(a)(1). It also suggests that the District Court considered the seriousness of the offense, the need for adequate deterrence, and the need to protect the public. *See* 18 U.S.C. § 3553(a)(2).

In addition, the District Court's discussion reflects a cognizance of the factors discussed in Application Note 3 to § 5G1.3 of the Guidelines. It is clear from the sentencing colloquy that the District Court understood the type and length of Watford's prior undischarged sentence, as well as the time Watford likely would serve on that sentence. (J.A. at 311.) *See* U.S.S.G. § 5G1.3 application note 3(a) & (b). There is no question that the District Court understood that the undischarged sentence was imposed by a state court. *See* U.S.S.G. § 5G1.3 application note 3(c). Finally, the District Court's recognition of the separate nature of the state and federal offenses suggests that the District Court was aware of the relevant surrounding circumstances. *See* U.S.S.G. § 5G1.3 application note 3(d). For these reasons, we conclude that the District Court afforded appropriate consideration to its decision to impose a sentence running consecutive to the undischarged state sentence, that the District Court imposed an appropriate incremental penalty over Watford's undischarged life terms, and, therefore, that the District Court did not abuse its discretion. *See United States v. Khouri*, 169 F. App'x 459, 467-68 (6th Cir. 2006); *United States v. Salomon-Carrillo*, 102 F. App'x 3, 7 (6th Cir. 2004).

## G. *Prior Drug Conviction*

Finally, in an argument made *pro se*, Watford contends that the District Court erred in regarding his prior drug conviction as a felony, rather than a misdemeanor, for purposes of permitting the Government to seek enhanced penalties under § 851. The prior conviction in question is Watford's July 1993 conviction in the Central District of Illinois for possession of approximately 29 grams of crack cocaine. Watford argues that because the district judge in that case imposed only a $25 misdemeanor special penalty assessment, rather than a $50 felony special penalty assessment, the prior conviction must have been a misdemeanor.

We review a district court's factual determinations regarding a criminal defendant's prior convictions for clear error. *United States v. Layne*, 192 F.3d 556, 575 (6th Cir. 1999). The District Court found that, while the Central District of Illinois did indeed impose a $25 misdemeanor special penalty assessment, its failure to impose the $50 special penalty assessment applicable to felonies was a mere "clerical error." (J.A. at 299.) In support of this conclusion, the District Court relied on statements made in the Order on Final Disposition by the district court in the Central District of Illinois. Noting that the jury acquitted Watford of felony possession of cocaine with intent to distribute and possession of a firearm in connection with a drug trafficking offense, the Order on Final Disposition indicated that the jury nevertheless found Watford guilty of the lesser included offense of possession of cocaine.

That offense is listed in 21 U.S.C. § 844(a) and is a misdemeanor, except that Congress went on to provide in the section:

> Notwithstanding the preceding sentence, a person convicted under this subsection for possession of a mixture or substance which contains cocaine base shall be in prison not less than five years and fined a minimum of $1,000 if the conviction is a first conviction under this subsection and the amount of the mixture or substance exceeds five grams.

The court finds that the evidence is persuasive that the defendant possessed 29 plus grams of cocaine base commonly referred to as crack.

(J.A. at 124.) Based on this language, the District Court below concluded that Watford's Illinois federal conviction was a felony.

We find no clear error in the District Court's findings. In *United States v. Sharp*, 12 F.3d 605, 605 (6th Cir. 1993), we held that "[u]nder 21 U.S.C. § 844(a), a person convicted of simple possession of more than five grams of crack cocaine is subject to imprisonment for not less than five years and not more than 20 years. Because the maximum term exceeds one year, the crime is classified as a felony under 18 U.S.C. § 3559(a) [pertaining to sentencing classification of offenses]." *See also United States v. Smith*, 34 F.3d 514, 518-19 (7th Cir. 1994) (acknowledging same). Accordingly, the District Court appropriately concluded that Watford's prior drug conviction was a felony, and that the imposition of a $25 misdemeanor special penalty assessment was merely a clerical error. Watford's *pro se* argument is meritless.

### III. CONCLUSION

For the reasons discussed above, we conclude that the District Court did not err in rejecting Watford's speedy trial and statute of limitations arguments and allowing this case to proceed to trial. Nor do we find error in the District Court's handling of voir dire and sentencing. Accordingly, we AFFIRM the District Court's judgment of conviction and sentence in all respects.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting. I disagree with the majority's conclusion that the United States has produced a neutral explanation for its use of a peremptory challenge to exclude Juror 298 from Watford's jury. Accordingly, I respectfully dissent.

The majority is correct in stating that Watford must be presumed to have established a prima facie case of purposeful discrimination. *See Hernandez v. New York*, 500 U.S. 352, 359 (1991) (holding that a prosecutor's proffer of a race-neutral justification for a challenged peremptory strike renders moot the question whether the defendant first established a prima facie claim under *Batson v. Kentucky*, 476 U.S. 79 (1986)); *Lancaster v. Adams*, 324 F.3d 423, 434-35 (6th Cir. 2003) (applying the *Hernandez* rule). The majority errs, however, in stating that, in this case, the government has proffered a race-neutral explanation with regard to Juror 298. On the contrary, the government has admitted that it "struck that one in error," Joint Appendix ("J.A.") at 202 (Voir Dire Tr. at 41), because the prosecutor "had a question mark by [the juror's name] *for reasons unknown*," *id.* at 202 (Voir Dire Tr. at 41) (emphasis added). Indeed, the prosecutor went even further at the *Batson* hearing, stating, "I don't see any reason to strike the person. Probably a good juror." *Id.* at 203 (Voir Dire Tr. at 42).[1]

The majority misinterprets my argument as holding that "a mistaken belief will not satisfy the second prong of a *Batson* analysis where the peremptory strike appears to be racially based." Maj. Op. at 16. This characterization obscures the vitally important distinction between a peremptory strike motivated by an erroneous *belief* and a peremptory strike erroneously *exercised*. The majority mistakes the latter for the former in this case. While it is true that courts have held that a genuine, non-discriminatory, but mistaken belief may defeat a *Batson* challenge, *see Hurd v. Pittsburg State Univ.*, 109 F.3d 1540, 1547 (10th Cir. 1997), no such belief is proffered here. Rather, the prosecution in this case concedes that it struck Juror 298 not for a mistaken reason but for *no reason at all*.

The majority's quotation, Maj. Op. at 16, of our opinion in *United States v. McFerron*, 163 F.3d 952 (6th Cir. 1998), is telling. In that case, we noted "the requirement that the proponent of a strike give a 'clear and reasonably specific' explanation of the legitimate reasons for exercising a peremptory challenge." *Id.* at 955 (quoting *Batson*, 476 U.S. at 98 n.20). The majority fails to disclose how it is that the "explanation" for a strike can possibly be any *less* specific than a disavowal of any reason at all. And, indeed, the Supreme Court has plainly stated that *Batson*'s step two requires the proponent of a strike to proffer an explanation based on some identifiable characteristic of the stricken juror:

> As with race-based *Batson* claims, a party alleging gender discrimination must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike. When an explanation is required, it need not rise to the level of a "for cause" challenge; rather, it merely must

---

[1]Although the prosecutor also mentioned that Juror 298 might initially have been singled out because of a family history of drug abuse, the prosecutor never claimed that he exercised the peremptory strike for that reason. Moreover, the prosecutor's other comments, quoted above, establish conclusively that there was no reason for the strike. Indeed, the prosecutor's admission, during the *Batson* hearing, that he remembered standing beside Juror 298 during a bench conference undermines his claim to have been mistaken about the juror's race. *See id.* at 202 (Voir Dire Tr. at 41) ("I struck that one in error. I don't really have any reason to strike that person. I now recall, he was the fellow that came to the bench that had drug use in his family, so —").

be *based on a juror characteristic other than gender*, and the proffered explanation may not be pretextual.

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 144-45 (1994) (emphasis added).

In sum, *Batson* and its progeny stand for the proposition that assertions of simple coincidence or mistake will not suffice as justifications for peremptory strikes that otherwise appear to be based upon race.[2] That is the thrust of the first prong of the *Batson* standard, which gives rise to a "necessary inference of purposeful discrimination" once a defendant has established his prima facie claim. *Batson*, 476 U.S. at 96. The rule established today eviscerates the first *Batson* prong by allowing a prosecutor to defeat the inference of discrimination simply by denying that the strike was racially motivated. *See* Maj. Op. at 17 ("Where the prosecutor has represented that he did not know juror 298 was an African-American, we are hard-pressed, on the record before us, to find discriminatory intent inherent in the proffered explanation."). To permit the United States to avoid the implications of the step-one inference by simply conceding — but not explaining – its error is to invite future violations.

Moreover, after construing the prosecution's disavowal of any reason for striking Juror 298 as a "reason," the majority compounds its error by affirming the district court's finding that Watford has not carried his ultimate burden of persuasion regarding the racially discriminatory nature of the strike. Maj. Op. at 17-18. The Supreme Court has recently indicated in dictum that, even if, under circumstances such as these, a court may correctly reach step three of the *Batson* analysis, its ultimate conclusion should be the opposite of that reached by the majority here:

> In the unlikely hypothetical in which the prosecutor declines to respond to a trial judge's inquiry regarding his justification for making a strike, the evidence before the judge [at step three] would consist not only of the original facts from which the prima facie case was established, but also the prosecutor's refusal to justify his strike in light of the court's request. Such a refusal would *provide additional support for the inference of discrimination raised by a defendant's prima facie case*.

*Johnson v. California*, 545 U.S. 162, 171 n.6 (2005) (emphasis added).

Accordingly, I would hold that the United States has failed to carry its burden at the second stage of the *Batson* inquiry; that Watford has, should we reach the third stage, carried his ultimate burden of persuasion; and, therefore, that the judgment must be vacated and the case remanded for new trial. I respectfully dissent.

---

[2] It should be noted that *Batson* has long applied to all race-based peremptory strikes, regardless of the race of the defendant or the stricken juror or of whether the two are of the same or different races. *Powers v. Ohio*, 499 U.S. 400, 402 (1991).